Isaac LYONS, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee, at Jackson.

Dec. 6, 1979.

Permission to Appeal Denied by Supreme Court Feb. 25, 1980.

Walker Gwinn, Public Defenders' Appellate Counsel, Edwin C. Lenow, Charles Wright, Asst. Public Defenders, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Sylvia Ford Brown, Asst. Atty. Gen., Nashville, Joseph L. Patterson, Edgar A. Peterson, IV, Asst. Dist. Attys. Gen., Memphis, for appellee.

## OPINION

DAUGHTREY, Judge.

The appellant-defendant, Isaac Lyons, was convicted of murdering Willie Earl Wilbourn, who was shot during the robbery of Dandy's Drive-In, a Memphis hamburger stand. The jury assessed a life sentence against Lyons; they acquitted his co-defendant, James Lee Clay. On appeal, Lyons challenges (1) the sufficiency of the convicting evidence, (2) the admissibility of his identification by three eyewitnesses to the murder, and (3) the trial court's failure to grant a mistrial following a comment made by the prosecutor during voir dire of the jury, which the defendant insists violated his Fifth Amendment right to remain silent. We find no reversible error in connection with these points, and we therefore affirm the jury's verdict.

The evidence showed that on the evening of June 10, 1977, 19 year old Willie Lee Wilbourn was working as a clerk in Dandy's Drive-In, along with three young women. Two men entered the drive-in, and Wilbourn and Spring Pipkin went to the window to take their orders. One of the men took a pistol from his pocket and demanded money. Wilbourn handed over the cash drawer but was inexplicably shot by one of the robbers. Pipkin then ran to the kitchen where Diane Heard and Annie Tartt, the short-order cooks on duty that night, were already hiding. Convinced there was other money on the premises, the robber yelled, "I'm giving you whores four seconds to bring that money up front," and he started counting, "One, two, three. . . ." When he got to three, Heard grabbed the money box from its hiding place behind the grill, took it to the front window, and turned it over to the robber. Meanwhile, Pipkin crawled to a phone and called for help.

At trial, the three surviving employees identified Lyons as the gun-wielding robber. Two other young women who had been in an automobile with Lyons and Clay near Dandy's at the time of the robbery also implicated Lyons in the murder. Carolyn Sorrels testified that the two defendants left the car, walked in the direction of Dandy's and returned with a box in which change was rattling. As the four drove from the neighborhood, Sorrels said she saw police cars at the drive-in. Later Sorrels overheard a discussion to the effect that Lyons had shot someone and she testified that she also heard Lyons say that he "hoped he didn't kill him, cause it would be on his conscience." She learned of the robbery-murder the next day from a newspaper account. Lyons' second companion, Mae Helen Mitchell, confirmed Sorrels' testimony. She also testified that Lyons told

her he "didn't mean to do it," when she spoke with him by telephone after his arrest. The State also introduced a cash register tray found at the side of a road, together with purchase orders, invoices and other documents from Dandy's Drive-In, with James Lee Clay's fingerprint on it.

Lyons admitted to police that he had been in the company of Sorrels and Mitchell on the night in question, but denied any knowledge of the robbery and murder. He consented to a search of his apartment, and police found pink-sponge hair curlers like those witnesses had said were worn by the robber who shot Willie Wilbourn. Clay also made a statement to police, in which he admitted being at Dandy's but denied any advance knowledge that a robbery was going to occur.

We think the evidence is clearly sufficient to support the jury's verdict as to Lyons' guilt, under the applicable standard of appellate review. Tennessee Rules of Appellate Procedure, Rule 13(e); see also *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The defendant contends, however, that a major portion of that evidence was illegally introduced against him. He insists that the police utilized suggestive measures in securing his identification by the three eye-witnesses and that therefore their pretrial and in-court identifications were tainted. We conclude that the evidence in the record is to the contrary.

Spring Pipkin identified Lyons in court, saying that she remembered him from the night of the robbery. She testified that she looked at mug books the day after the robbery and picked out a picture of a man that "looked like" Wilbourn's murderer. Four days after the murder, she viewed a lineup in which the defendant was not present and again identified a man who "looked like" the robber. Three days later she viewed a second lineup; she did not make a positive identification but told police that number six (the defendant) "favored" the robber. After the second lineup, she was shown a group of six photographs, and she selected the defendant. She was then told that he was the same person in position number six in the lineup.

Diane Heard also identified the defendant from having seen him on the night of the robbery. She had viewed mug books on the day after the robbery and had selected a photo of a man resembling the defendant. She attended a lineup three days later, making no identification, but on June 17, a week after the robbery, she attended a second lineup, and she identified number six (the defendant) as the person who robbed Dandy's Drive-In. Prior to attending the second lineup, she had also viewed an array of six photographs and had selected a photograph of Lyons. On cross-examination she conceded that seeing his photo "may have helped her", but she also said that she remembered Lyons from the robbery and that she thought she could have identified him in the lineup even if she had not seen the photographs. There was no evidence to indicate improper police conduct of the photographic display presented to Heard prior to the lineup.

Annie Tartt also identified Lyons in court. She testified that she viewed mug books at police headquarters, selecting a photograph of a man who resembled the robber. She could identify no one at the first lineup she attended. At the second lineup, an officer opened the door to the room in which the lineup participants were standing and the man in the number six position, whom she recognized as the robber, looked towards the door. She was suddenly frightened that he would get out, and out of fear she indicated on her card that she could not identify anyone. But as she left the lineup room she told an officer of her experience, and he gave her another card on which she indicated that she had recognized number six (Lyons). She was later shown six photographs, from which she selected Lyons' photo.

In each instance, the trial judge ruled that the measures undertaken by the police to secure the eyewitness identifications were not suggestive, and determined that the in-court identifications of Lyons were in no way tainted by police proce-

dures. The proof in the record fully supports his conclusions, and we concur in his finding that the evidence in question was admissible.

Finally, the defendant claims that the prosecutor violated his right to remain silent in making the following comment during selection of the jury:

> "Even though [defense] counselors have numerous times stated their client doesn't have to take the stand, nothing precludes them from doing so, or putting on any witnesses in their behalf, so that every one of you will understand that. So, the law is, that you can't hold them against it [sic] they don't choose to do that, so do we understand that, please ma'am?"

Apparently the prosecutor's comment was in response to this sort of questioning by defense counsel:

> MR. LENOW: Would any of you make the defendant put on proof whatever before acquitting him of the charges? If the defendant doesn't put on proof, would you acquit him if the State hasn't made out its case, put on proof beyond a reasonable doubt and to a moral certainty? Would anybody make the defendant put on any proof?
>
> JURY: (Negative response).
>
> MR. LENOW: Would anybody hold it against the defendant if he did not take the witness stand?
>
> JURY: (Negative response).
>
> MR. LENOW: His Honor is going to charge you, as to the law, something along the lines that you can not consider as evidence, the fact that the defendant, does not testify in this particular case, would any of you, can you follow what His Honor will charge you?
>
> JURY: (Positive response).

Counsel for Lyons' co-defendant had also commented during voir dire:

> Your Honor will tell you that the defendant does not have to testify; either one of them. They may if they wish, but they don't have to. You can't use that against them.

The defendant requested a mistrial, based on the prosecutor's statement to the jury. The trial judge admonished counsel for the State that "a better view is not even to talk about . . . whether [the defendant will] take the stand or not," regardless of related statements made by a defendant or his counsel. But the Court noted that defense counsel had already raised the question before prospective jurors numerous times, and that the jury selected to hear the case would be instructed that a criminal defendant has a right not to take the stand in his own behalf. He ruled that the comment, taken in context, was therefore not sufficient to require the declaration of a mistrial.

■ Applying the three-prong test of *Anderson v. Nelson*, 390 U.S. 523, 524, 88 S.Ct. 1133, 1134, 20 L.Ed.2d 81 (1968), we hold that any error in this regard was harmless beyond a reasonable doubt. The comment was not extensive, no inference of guilt from silence was stressed to the jury as a basis of conviction, and there was little or no proof at trial that could have supported acquittal. We nevertheless echo the trial judge's warning to the prosecutor concerning the unnecessary and wholly gratuitous risk involved in *any* comment on the defendant's valued right to decide whether he will testify or not, as well as the exercise of that decision. Put simply, the subject should be considered "off-limits" to any conscientious prosecutor who is interested in upholding his oath and in maintaining his duty to the courts and to the people of Tennessee.

We find no reversible error in the record. We therefore affirm the judgment of the trial court.

WALKER, P. J., and TATUM, J., concur.