# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### (HEARD AT NASHVILLE)

FILED

May 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

|  |  |  |
|---|---|---|
| STATE OF TENNESSEE, | ) | FOR PUBLICATION |
|  | ) | **Filed: May 17, 1999** |
| Appellee, | ) | Hamblen County |
|  | ) |  |
| v. | ) | Hon. Lynn W. Brown, |
|  | ) | Judge |
| LEONARD EDWARD SMITH, | ) |  |
|  | ) |  |
| Appellant, | ) | Supreme Court |
|  | ) | No. 03S01-9710-CC-00129 |

FOR APPELLANT:

J. Robert Boatright
Kingsport, Tennessee

Larry S. Weddington
Bristol, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Amy L. Tarkington
Senior Assistant Attorney General
Nashville, Tennessee

H. Greely Wells, Jr.
District Attorney General
Second Judicial District
Blountville, Tennessee

# O P I N I O N

|  |  |
|---|---|
| TRIAL COURT AND | |
| COURT OF CRIMINAL APPEALS AFFIRMED. | DROWOTA, J. |

In this automatic appeal,[1] the defendant, Leonard Edward Smith, raises numerous challenges to the decision of the Court of Criminal Appeals which affirmed his sentence of death for the 1984 murder of Novella Webb. After carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court entered an Order limiting review at oral argument to the following three issues:[2]

> (1) Whether the trial court was correct in allowing the defendant to control the presentation of mitigating evidence and to waive closing argument against counsel's advice;

> (2) Whether the admittance of victim impact testimony and argument at the sentencing hearing constituted reversible error;

> (3) Whether the sentence of death is arbitrary or disproportionate in violation of Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D) (1997 Repl.).

After fully considering the record and the defendant's claims, we conclude that none of the alleged errors have merit. Contrary to Smith's assertions, the trial court had no authority to override the will of a competent and informed defendant and force Smith to present mitigation evidence and closing argument in his capital sentencing hearing. Moreover, the trial court did not err in allowing the State to present victim impact evidence and argument during the capital sentencing hearing. Finally, the evidence supports the jury's findings as to the aggravating and mitigating

---

[1]Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.) provides as follows: "[w]henever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

[2]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider <u>all</u> errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's sentence of death is affirmed.

## BACKGROUND

In 1984 the defendant, Leonard Edward Smith, his friend, David Hartsock, and his girlfriend, Angela O'Quinn, robbed two small grocery stores in rural Sullivan County. Armed with a .32 caliber pistol, Hartsock entered Malone's Grocery alone, while Smith and O'Quinn waited for him outside the store in Smith's car. During the course of the robbery, Hartsock shot and killed John Pierce. The trio left Malone's Grocery and proceeded to Webb's store near the Carter-Sullivan County line. Both Smith and Hartsock entered Webb's store.[3] Smith was carrying the gun, and during the robbery, he shot and killed Novella Webb. The victim and her husband owned and operated the store.

The defendant was charged with two counts of first degree murder for the killings of Pierce and Webb. The offenses were joined for trial, and, at Smith's request, venue for the trial was changed from Sullivan to Hamblen County. Smith was convicted on both counts of first degree felony murder. At the conclusion of the proof, the State withdrew its notice of intent to seek the death penalty with respect to the Pierce murder, and the trial court imposed a life sentence. However, the jury

---

[3]Smith had left Angela O'Quinn alongside the road a short distance from Webb's store.

imposed a sentence of death for the Webb murder. On his first direct appeal, this Court affirmed Smith's conviction and life sentence for the killing of Pierce, but reversed Smith's conviction of first degree murder and sentence of death for the Webb murder. Concluding that the offenses should not have been joined for trial and also finding prosecutorial misconduct during final argument, this Court reversed and remanded the case for a new trial. State v. Smith, 755 S.W.2d 757 (Tenn. 1988) ("Smith I").

Smith was re-tried and again convicted of first degree felony murder and sentenced to death for the Webb killing. On the second direct appeal, this Court affirmed the conviction, but again vacated the death sentence, finding that the jury had been improperly allowed to consider the life sentence imposed for the Pierce murder in considering whether or not Smith should be sentenced to death for the Webb murder, and that the felony supporting the conviction of first degree murder had been improperly used to establish the felony murder aggravating circumstance in violation of State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). The case was remanded to the trial court for a third sentencing hearing. See State v. Smith, 857 S.W.2d 1 (Tenn. 1993) ("Smith II").

This case is Smith's appeal from the third sentencing hearing which was held in Hamblen County. [4] The State again sought and obtained the death penalty for the murder of Novella Webb. The State introduced very little proof regarding the

_____

[4]Prior to the third resentencing hearing, the trial judge denied a motion for recusal and *sua sponte* changed the venue from Hamblen to Johnson County. The Court of Criminal Appeals granted an extraordinary appeal, found that the trial court had erred by changing venue without the defendant's consent, but concluded that the refusal of the trial judge to recuse himself was not error. State v. Smith, 906 S.W.2d 6 (Tenn. Crim. App. 1995).

circumstances of the offense at this third sentencing hearing.[5] After waiving opening statement, the State introduced proof to establish the single aggravating circumstance upon which it relied to support imposition of the death penalty -- "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, which involve the use or threat of violence to the person." Tenn. Code Ann. § 39-2-203(i)(2) (1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1998)][6]

The State's proof consisted of copies of indictments and judgments reflecting that the defendant had been convicted of robbery in Carter County on October 13, 1980, and on February 21, 1985, and that the defendant had been convicted of first degree murder for the killing of John Pierce on March 20, 1985. The reference to the life sentence imposed for the Pierce murder conviction had been redacted from the copy of the judgment passed to the jury. The State also introduced the judgment which established that the defendant had been convicted of the first degree murder of the victim in this case on August 23, 1989. With respect to each of these convictions, the State offered identification testimony to establish that Leonard

---

[5]While trial strategy is a matter within the discretion of the district attorney, we note that the State should offer some proof regarding the circumstances of the offense in its case-in-chief when seeking the death penalty at a resentencing hearing. The proof need not be as detailed as that offered at the guilt-innocence phase of the trial; however, *some* proof is essential to ensure both individualized sentencing by the jury and effective comparative proportionality review by the appellate courts. See State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994)(rejecting a defendant's claim that proof regarding the circumstances of the offense is not admissible at resentencing hearings and holding that such proof is necessary to provide individualized sentencing). In this case, the defendant offered his statement which included a description of the circumstances of the offense.

[6]The aggravating circumstance now provides:"[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person."

Edward Smith is the same person who was previously convicted of the robbery and murder offenses.

As its final witness, the State called Katy Mahoney, the daughter of the victim in this case. Mahoney testified that her father and mother had operated the country store Smith robbed for many years and that her mother had been fifty-nine-years-old when she was murdered. Mahoney testified that her father was seventy-eight-years-old at the time of the robbery and murder and that his ribs had been broken during the episode when he was pushed into a trash can. According to Mahoney, her father's health had declined "drastically" after the robbery and murder. He was never able to work again and eventually sold the store. He died the next year from a brain tumor. When asked how the family had been affected by her mother's murder, Mahoney testified that the murder "won't go away," that "we live with it all the time" and that "it's caused problems now for eleven years." The State rested its case-in-chief at the conclusion of Mahoney's testimony.

In mitigation the defense called Sullivan County Sheriff Keith Carr, who in 1984 had been the detective in charge of investigating the Webb murder. Shortly after his arrest, Smith had given Sheriff Carr a statement recounting his involvement in the murders of both John Pierce and Novella Webb. The entire statement, which the detective read to the resentencing jury at the request of defense counsel, is set forth below.

> I, Leonard Edward Smith, am giving this statement of my own free will and without any threats or promises being made to me. On Monday, May 21, 1984, I was with my girlfriend Angie O'Quinn and David

Hartsock, and, we went and got some liquor and went to a road near the Sullivan-Carter County line. We parked and were just drinking and talking and smoked some joints. While we were on that road in my black Ford Pinto which I had painted black because it used to be orange, David said "Get out, I want to talk to you." He and I got out and walked a ways from the car where Angie couldn't hear us talking and David said, "I can get us a little bit of money here at this store." He said, "It's the store down at the county line." I asked him if it was Shorty Malone's and he said, "Yes." Angie and I drove David down there, and let him off a little ways from the store. I parked on a little paved road beside the store. David had a .32 caliber chrome-plated pistol with him. The pistol was his pistol. I heard several shots fired and just a few seconds later David came running around the store. David jumped into the car and said, "Get the hell out of here, I had to shoot him." I figured it was Shorty because he ran the store. We drove out the road that goes beside of Malone's Grocery and it dead ends and you can turn left to the Wautauga area, or right back to Sullivan County. We turned onto the Wautauga Highway and drove to what is known as Mountain Road. I asked David if he shot the man, and he said, he shot him one time and the man pulled a gun and started shooting at him. I don't remember if he said what money he got. I drunk some more liquor, and made Angie get out of the car. I started drinking and was just going to drive us out of the mountain. We came out at some store, and I turned left and, drove until I realized I was going to [sic] wrong way, and I pulled it in at Webb's Store to turn. I stopped the car at Webb's and David jumped out, and I ran in the store behind him. David ran and jumped on the counter, and knocked the old man over and yelled to me to, "get that bitch" referring to an old woman at the end of the counter. I started towards her, and she started throwing things at me and started spraying paint on me. I fired one shot just to scare people, but, the old woman just kept spraying orange paint and came towards me. I couldn't see because of the paint and I held the gun up and apparently the old lady was trying to get the gun away from me and it went off. We ran from the store when I fired the second shot. I didn't really know that I had shot her until we heard it later on the news. When we were in Webb's Store the old man was hollering, "help me, help me," and hollering for his wife. The old woman never did say anything that I remember. I know that before we left the store, some man came up to the door, and I told him to get out of there. I didn't get any money from either store, and David didn't say if he did or not. David and I left Webb's and went back up towards Mountain Road, and picked Angie up. I told her we had to get out of there, and we drove down towards Underwood Park, and set the car on fire. David cut a hose next to the carburetor and set the car on fire. David, Angie and me took off on the trails, and really didn't know which way to go. We came out at a house on Indian Creek. It was the Johnson residence because my dad had sold them the house. We didn't go to the house until late last night, and Angie got Gladys Sheets to take us to the home where we were arrested this morning. I had

never been to the house before but had been in the area. When Gladys drove us to Dennis Cove, she said she thought we did it. I had taken my shirt and wrapped my feet so I could walk and I think I left it in Gladys' car or at the house. Gladys had told us that Mrs. Webb, and the man at Malone's were both dead. We told Gladys that we didn't do it and she said, "If you didn't, you better keep the gun because the news said it was a .38," and she knew we had a .32 caliber. I told David to throw the gun out anyway because I knew we had done it. He threw it out as we went over a bridge, and we drove on up to the house. We stopped at a grocery store, and Angie and Gladys went in and got some food for us to take to the house. We fixed something to eat, and went to sleep, but, I felt like they knew where we were at. I had cut mine and David's hair with a pair of scissors Angie had in her pocketbook because I knew they would be looking for somebody with longer hair. This morning I heard a loud noise, and I knew we were caught then. I told Angie, "I'm going out, and you come out too, so we won't get hurt." Somebody had yelled for us to come out, and David went out first. All I know is that everything didn't turn out the way it was supposed to, and it shouldn't have happened. I am sorry for what happened, because I know I am a thief, but, I don't think of myself as a murderer. This is all I know to tell you about what happened.

On cross-examination, Sheriff Carr said that Webb has been killed approximately forty-five minutes after John Pierce, and he estimated that the driving time from Malone's Store to Webb's Store is about thirty minutes. Sheriff Carr had examined the murder scene at Webb's store and had searched for a bullet in a pool of blood about an inch deep by using a vegetable strainer. In his search, Sheriff Carr discovered a mark on the wall behind the counter at Webb's store which had been caused by a bullet striking the wall. He also had observed the victim's body and said that the bullet which caused death entered at the victim's right nasal passage. The .32 caliber gun used in the Webb murder was found underneath a railroad bridge. Orange paint spots were visible on the gun when it was recovered, and it had six live rounds in the chamber. According to Sheriff Carr, the route Smith claimed to have driven after leaving Webb's store was along a curvy, mountainous, dirt road which was very treacherous. A day or so after the murder, Sheriff Carr found the

defendant's badly burned car near an area where Smith had been camping with Hartsock and O'Guinn prior to the murder. Also found at that site were partially burned articles of Smith's clothing and strands of Smith's and Hartsock's hair which had been cut to disguise their appearance. Sheriff Carr testified that Smith, Hartsock, and O'Guinn were arrested on May 23, 1984, while hiding in a home in an isolated area of Dennis Cove. Gladys Sheets, one of Hartsock's relatives, had driven the trio to this location and had stopped along the way to allow O'Quinn to purchase food and camping supplies. A live .32 caliber round was found in Smith's pocket when he was arrested. Smith's and Hartsock's hair had been cut very short. At the time of the Webb murder, Smith was twenty-three-years old. Hartsock and O'Quinn were eighteen or nineteen years of age. Though Smith said he felt remorse, Sheriff Carr testified there was nothing indicative of remorse in Smith's demeanor when he gave the statement.

During the cross-examination of Sheriff Carr, a jury-out hearing was held to determine the permissibility of certain questions. During this hearing Smith ordered his attorneys to present no further proof in mitigation and to waive final argument. After a lengthy discussion with counsel, the trial court determined that the defendant was competent to make the decision as to whether to offer additional proof and argument. After further consultation with Smith, defense counsel honored his request and presented no further mitigating evidence.

In rebuttal, the State recalled Mahoney who testified that during the eleven years since the murder, she had never seen evidence to indicate the defendant felt remorse. Following this testimony, the State made a closing argument, but in

accordance with the defendant's instructions, defense counsel waived closing argument.

Based on the proof submitted at the sentencing hearing, the jury found that the State had proven the aggravating circumstance beyond a reasonable doubt, and in addition, the jury found that the State had proven that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.[7] As a result, the jury imposed a sentence of death by electrocution. The trial court entered a judgment in accordance with the jury's verdict, and the Court of Criminal Appeals affirmed. The case was then docketed in this Court. For the reasons explained below, we affirm the judgment of the Court of Criminal Appeals.

# I.

## WAIVER OF MITIGATION

In this Court, Smith argues that once a defendant has chosen to be represented by counsel, the decision to present mitigating proof and argument is a strategic and tactical decision for counsel, and not a personal right of the defendant. Smith also argues that allowing a defendant to waive his or her right to present mitigating proof conflicts with the heightened reliability required in death penalty cases and impedes meaningful appellate review. Finally, Smith argues that even if a defendant represented by counsel retains the authority to waive his or her right to present mitigating proof and closing argument, such a waiver is valid only if the

---

[7]Though Smith was not entitled to the "beyond a reasonable doubt" weighing standard since this offense was committed before the statute was amended in 1989, any error in this regard inured to the defendant's benefit. State v. Bush, 942 S.W.2d 489, 506 n.10 (Tenn. 1997).

defendant is competent to understand the rights being waived and the potential consequences of the waiver. Smith argues that the waiver in this case is invalid because the record does not establish competency.

The State responds that the right to present a defense belongs to the defendant, and a trial court may not force a competent defendant to follow the advice of counsel and present a defense. The State argues that the trial court did not err because the record in this case establishes both that Smith was competent and that he voluntarily and knowingly chose to waive mitigation and closing argument. We agree.

The arguments advanced by Smith in this appeal were recently considered by this Court in a post conviction capital case, Zagorski v. State, 983 S.W.2d 654 (Tenn. 1998). There, Zagorski, the petitioner, had alleged that defense counsel were ineffective at the sentencing phase of his capital trial because they had followed his explicit instructions and had not investigated or presented mitigating evidence. The proof introduced at the evidentiary hearing on the petition established that prior to trial Zagorski had asked his attorneys not to investigate or present mitigating proof in the event of a conviction because he preferred a death sentence to a sentence of life imprisonment. Though Zagorski's attorneys advised him of the importance and need to investigate and introduce proof in mitigation regarding his family background at the sentencing phase of his capital trial, he prohibited his lawyers from contacting his family or investigating his past.

When the jury found Zagorski guilty of first degree murder, he adhered to his decision and refused to allow his lawyers to present mitigating evidence at the sentencing phase of his trial. Though counsel repeatedly advised Zagorski of his right to present mitigation proof and of the potential consequences of his decision to forego investigation and proof, Zagorski remained steadfastly committed to his chosen course of action with full awareness that it very well might result in a death penalty. Id. at 658-59.

In rejecting Zagorski's claim of ineffective assistance of counsel, this Court recognized that "[c]ounsel's role in a criminal case is to assist the defendant in making a defense and to represent the defendant before the court." Zagorski, 983 S.W.2d at 658 (citing State v. Franklin, 714 S.W.2d 252, 262 (Tenn. 1986)). However, we emphasized that "[u]ltimately . . . the right to a defense belongs to a defendant." Id. We cautioned that decisions such as "whether to forego a legally available objective because of non-legal factors are for the client and not the lawyer." Id. "[A]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" Id. at 658 (quoting Illinois v Allen, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J. concurring)). Accordingly, we concluded that counsel will not be adjudged ineffective for following the decision of a competent and fully informed defendant who chooses to forego investigation and presentation of mitigating evidence at the sentencing phase of a capital trial. Id. at 958. In so holding, we acknowledged the importance and constitutional significance of mitigating proof in a capital sentencing proceeding. We distinguished Zagorski's situation from cases in which attorneys simply fail to investigate and present

mitigating proof.  Id.  We emphasized that a defense attorney's failure to investigate

and present mitigation proof generally is considered below the range of competence,

but an attorney is not incompetent if the failure to investigate is "solely and alone" the

result of the defendant's instructions.  Id.


Accordingly, in Zagorski, we rejected the arguments advanced here by Smith

-- that a defendant who is represented by counsel may not waive the right to present

mitigating proof and that such a waiver violates the heightened reliability required in

death penalty cases.  Instead we held that a defendant may waive the right to present

mitigation proof so long as the defendant is competent.  To aid trial courts in

determining whether defendants are competent and fully informed at the time a

waiver is given, we set forth the following procedure for use in prospective cases:

> [C]ounsel must inform the trial court of these circumstances on the record, outside the presence of the jury.  The trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:
>
> > 1.  Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;
> >
> > 2.  Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and
> >
> > 3.  After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence.

-13-

Zagorski, 983 S.W.2d at 660-61.

Considering the record in this case in light of the procedure adopted in Zagorski, Smith's contention that he was not competent to waive his right to present mitigating proof and closing argument is clearly without merit. Although the trial court in this case did not have the benefit of our decision in Zagorski, the procedure utilized in this case to determine Smith's competence and to advise him of the potential consequences of his decision were substantially similar to those adopted in Zagorski. After Smith stated, "I'm ready to rest," during a jury-out hearing, one of Smith's attorneys advised the trial court that Smith had instructed him earlier that morning to waive mitigation. Defense counsel advised Smith against waiving mitigation, but Smith continued to insist upon that course of action. When the trial court asked if any expert psychological proof raised question about Smith's competency, defense counsel responded, "not anything that would justify any claim that he was incompetent I don't feel like. If I'd felt like that before today obviously I would have made it known to the court." At that point the trial court accurately stated the law as follows:

> Well, this is a bit of a difficult situation. In general, an attorney must represent a client, and the rule is that the client determines what is in his interest and what he wants done, and then the lawyer has an obligation to, first of all, advise the client regarding alternatives; but, after giving proper and thorough advice, to follow the wishes of the client. Is that not correct, Gentlemen?

To the trial court's inquiry, Smith's attorneys responded, "Yes, sir" and "Yes, Your Honor." Before making a final decision on this issue, the trial court allowed defense counsel a twenty minute recess to confer privately with Smith regarding his desire to waive mitigation. When the hearing reconvened, defense counsel reported that they

-14-

had informed Smith that they were prepared to present mitigation proof, had advised him of the benefits of presenting the proof, and had warned him of the harm which could result if the proof was not presented. Despite this advice, Smith had remained insistent that they "rest the case and waive argument."

At this point, the trial court attempted to question Smith to ensure that he understood his rights and the potential consequences of his decision. Because the trial court had admonished Smith earlier in the trial to speak only through his attorneys and to refrain from speaking aloud during the testimony of other witnesses, Smith refused to be sworn and would not respond to the trial court's inquiries except through his attorneys. Smith advised his attorney to inform the trial court that he wanted to rest his case and waive argument. At that point, the trial court advised Smith as follows:

> if you cease putting on mitigating evidence and you instruct your counsel to not argue and they do both, they don't put on any other proof, and they do not argue in your benefit, in the court's opinion this jury will almost certainly return with a verdict of death by electrocution. And, I guess I've only seen perhaps twelve or thirteen death penalty cases tried and most of them did not result in a death penalty verdict. But, from those that I have seen in five or six death penalty verdicts, actually about half; but if your attorneys follow your instructions that will be the very likely result. Do you understand that, sir?

Smith, through his attorney, answered "Yes" to the trial court's question.

The trial court further questioned defense counsel about the defendant's competence. On the first occasion, counsel stated, "Of course, I've known Leonard now for ten or eleven years. He's always been competent, at least, in my opinion." After commenting that the defendant's attorneys had each practiced law for twenty years, the trial court inquired once again, "And, you have no personal doubts as to

his competency and legal ability to make such a decision I take it?" Neither attorney expressed any doubt about Smith's competence to waive mitigation. Before recalling the jury, the trial court commented that he had observed Smith confer with counsel and actively participate in the case and once again advised Smith of his right to present mitigation and of the likely consequences of the waiver. Smith adhered to his decision to waive mitigation and argument. When the jury was recalled, the defense rested.

Clearly, the record in this case indicates that the trial court fulfilled its obligation to ensure that Smith was competent and fully advised of his rights and of the likely detrimental consequences of waiving those rights before he accepted Smith's decision. The trial court repeatedly inquired about Smith's competence and actively invited counsel to present evidence that Smith was not competent. No such evidence was presented by defense counsel, because, according to their responses to the trial court, no such evidence existed. Had such evidence existed, we have no doubt that these experienced attorneys would have presented it to the trial court at the jury-out hearing, particularly in light of the trial court's specific questions regarding its existence. As we stated in Zagorski, supra, a competent defendant who knowingly and voluntarily chooses a defense strategy will not later be able to complain about the detrimental consequences which result from the decision. The record in this case reflects that Smith was competent and fully informed when he decided to waive his rights. Smith may not now complain about the consequences of his decision. Accordingly, we conclude that Smith's claim that the trial court erred by allowing him to waive mitigation and argument is without merit.

## II.

### VICTIM IMPACT EVIDENCE

The defendant next argues that the trial court erred by allowing the victim's daughter to testify about the effect of her mother's death on her family and by allowing the prosecutor to mention this testimony in closing argument. Smith asserts that victim impact testimony is barred by the federal and state constitutions and by the language of the capital sentencing statute. We disagree.

Recently, in State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), this Court held that victim impact evidence is permissible under both the United States and Tennessee Constitutions. Id. at 889. In addition, we held that such evidence is permissible under the Tennessee capital sentencing statute because it is "relevant to punishment." Id. However, we stated that "[g]enerally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed," such as "the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Id. at 891. We explained that trial courts may exclude victim impact evidence which threatens to render the trial fundamentally unfair or which poses a danger of unfair prejudice, and we opined that evidence of the emotional impact of a murder on the victim's family should be most closely scrutinized. Id. As a result, we held that the State should provide pretrial notice of its intent to offer victim impact evidence to enable trial courts to carefully supervise admission of such proof. Upon receiving notification, trial courts must hold

a hearing outside the presence of the jury to determine the admissibility of the evidence. We cautioned that victim impact evidence should not be admitted until the trial court has determined that evidence of one or more aggravating circumstances is present in the record. Id. We also suggested a jury instruction for use in all subsequent cases involving victim impact proof. Id. at 892. In Nesbit, we also upheld the constitutional permissibility of victim impact argument by prosecutors, but we cautioned prosecutors to exercise restraint and admonished that reversal may result if prosecutors engage in victim impact argument which is little more than an appeal to emotions and vengeance.[8] Id.

In this case, Mahoney's testimony was brief and is contained in approximately five pages of transcript. In sum, Mahoney told the jury that her parents were Worley and Novella Webb; that she had been their only child; that her son, the victim's only grandchild, had been eleven years old at the time of the murder; that her parents had owned and operated the small grocery store in Sullivan County for a number of years; that her parents had lived in a house near to and visible from the store at the time of the murder; that her mother had been fifty-nine at the time she was killed; that her father had been seventy-eight at the time of the murder; that her father had sustained broken ribs when he was pushed during the murder; that her father's health had steadily declined after the murder; that her father had become unable to work and had sold the store after the murder; and that her father had died the next year from

---

[8]In this case, the dissent advocates the adoption of procedures utilized in New Jersey and opines that our decision in Nesbit permits victim impact evidence which is "wholly undefined, amorphous, and unduly prejudicial, a result prohibited by Article I, section 8 of the Tennessee Constitution." The dissent's conclusion is puzzling in light of the fact that the procedures adopted by this Court in Nesbit closely mirror those utilized in New Jersey, with the only apparent difference being the New Jersey requirement of a written victim impact statement.

a brain tumor. When asked if she remembered the day her mother was murdered, Mahoney said, "I'm afraid I'll go to my grave with it." When asked about the effect of the murder on her family, herself, and her son, Mahoney replied, "Well, it just won't go away. We live with it all the time, and it's affected us in every way. It affected my dad. It's affected me. I mean, it's caused problems now for eleven years."

Though the trial court did not have the benefit of our decision in Nesbit in this case, it is clear that neither the victim impact evidence nor argument violates the constraints outlined in Nesbit. Mahoney briefly and concisely related the physical, financial, psychological, and emotional impact of this murder upon her family. The evidence appropriately was not admitted until the State had first introduced proof of the aggravating circumstance. Clearly, this testimony did not render the trial fundamentally unfair nor pose a danger of unfair prejudice. Likewise, the prosecutor's argument in this case was restrained and appropriate. In fact, the prosecutor referred to the testimony only once, stating, "You've heard how it affected the family of the only child of Mr. and Mrs. Webb. Eleven years later it's still here. It won't go away." Accordingly, we conclude that Smith's complaints regarding the admission of victim impact evidence and argument are completely without merit.[9]

---

[9]Since the victim impact evidence and argument in this case was so minimal, the dissent's finding of prejudicial error is equivalent to a holding that victim impact evidence and argument is inadmissible in all cases.

# III.

## PROPORTIONALITY REVIEW

We must next consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D) (1997 Repl.). In this case, the defendant argues that his sentence of death should be set aside as disproportionate because he did not unduly torture the victim but instead accidentally shot her during the course of the robbery. A death sentence will be considered disproportionate if, taken as a whole, the case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Id. at 665. Our role in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics." Id. Instead, our duty "is to assure that no aberrant death sentence is affirmed." Id.

In choosing and comparing similar cases, we consider many variables, some of which include: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and

-20-

effects on nondecedent victims. Id. at 667. When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Comparative proportionality review is not a rigid, objective test. Id. at 668. We do not employ mathematical or scientific techniques. In evaluating the comparative proportionality of the sentence in light of the factors delineated above, we rely also upon the experienced judgment and intuition of the members of this Court. Id.

Applying these factors, we note that the proof in this case reflects that the victim died from a gunshot wound to her head. She was killed while trying to protect her husband and her property, the family store which she and her husband had owned and operated together for many years. The defendant's claim that the shooting was accidental obviously was not believed by the jury. The jury's rejection of that claim is understandable in light of the fact that Smith shot and killed Novella Webb within forty-five minutes of the Pierce robbery and murder for which he had driven the get-away car. There was certainly no proof of provocation or justification for this killing. While the victim was trying to defend herself, her only weapon was a can of orange spray paint. The defendant obviously realized that the victim and her elderly husband were helpless. According to the defendant's own statement, Mr. Webb had been pushed into a trash can and had called out to his wife for help during the course of the crime. Though the defendant stated that he had been drinking

alcohol and smoking marijuana prior to the crime, there is no evidence to show that his judgment or abilities were impaired. To the contrary, after the murder Smith returned to his campsite by way of a treacherous mountain road. Once there, he and Hartsock burned Smith's car, cut their hair, and attempted to evade detection by traveling through the woods to Hartsock's relative's home. These attempts to conceal the crime and destroy the evidence indicate that Smith was in command of his senses and not impaired by drugs or alcohol. The defendant was twenty-three-years-old at the time of the murder, four or five years older than both Hartsock and O'Quinn. Smith had a history of criminal activity including robbery convictions in 1980 and 1985 as well as a conviction for the first degree murder of John Pierce. After he was apprehended, Smith cooperated with police by giving a statement about the murders. Although Smith expressed remorse in his statement, the victim's daughter testified that she had not received any statement of remorse from the defendant since the killing. There is no evidence in the record regarding the defendant's capacity for rehabilitation. In fact, other than the defendant's statement describing the killing as accidental, there is no mitigating proof in the record since the defendant waived his right to present that proof. Considering the nature of the crime and the defendant, we conclude that imposition of the death penalty for the senseless murder of this fifty-nine-year-old woman is not disproportionate to the penalty imposed in similar cases, and that this murder places Smith into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Harries, 657 S.W.2d 414 (Tenn. 1983), the defendant, a thirty-one-year-old man, shot the eighteen-year-old female store clerk in the head during the course of robbing a convenience store. The defendant argued that the gun had gone off accidentally and claimed that he had intended only to rob the store. As in this case, Harries asserted that he had been under the influence of drugs and alcohol at the time of the shooting. The jury rejected the defendant's argument, and, as here, found him guilty of first degree felony murder. The jury imposed the death penalty upon finding that the defendant was previously convicted of one or more felonies which involve violence to the person including armed robbery and kidnapping. Tenn. Code Ann. § 39-2-203(i)(2) (1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(2) (1998 Supp.)].[10] As in this case, Harries' claim that the shooting was accidental was not believed by the jury. Also, like this case, Harries' claim of alcohol or drug impairment was undermined by his calculated actions after the killing when he divided the proceeds of the robbery with his friends and family and absconded to Florida.

In State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), the twenty-three-year-old defendant murdered the victim during the course of a burglary of the victim's home. Cribbs also shot and severely injured the victim's husband during the course of the crime. As in this case, the defendant struggled with one of the victims for the gun. The defendant prevailed in the struggle and murdered the victim. The jury imposed

---

[10]The jury also found a second aggravating circumstance in Harries, that the murder was committed during the course of a felony, robbery. However, under State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the jury should not have been permitted to rely upon that aggravating circumstance to support imposition of the death penalty. However, the Middlebrooks error in Harries previously has been held to be harmless beyond a reasonable doubt under State v. Howell, 868 S.W.2d 238 (Tenn. 1993).

the death penalty upon finding two aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use or threat of violence to the person; and (2) the murder was committed while the defendant was engaged in committing or was attempting to commit a burglary. Tenn. Code Ann. § 39-13-204(i)(2) & (7)[11] (1991 Repl.). As in this case, Cribbs had been previously convicted of three serious felony offenses including two convictions of attempted second degree murder, one conviction for aggravated robbery, and one conviction for second degree burglary.

In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the twenty-seven-year-old defendant murdered a convenience store clerk by shooting him in the head during the course of a robbery. As in this case, the jury found the defendant guilty of first degree felony murder and imposed the death penalty upon finding that the defendant was previously convicted of one or more felonies involving violence to the person, including murder and aggravated burglary. Tenn. Code Ann. § 39-2-203(i)(2) (1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(2) (1998 Supp.)].[12] Howell had been previously convicted of first degree murder, armed robbery, and attempted first degree murder.

---

[11]Though the jury in Cribbs should not have been allowed to rely upon the felony murder aggravating circumstance to support imposition of the death penalty, this Court held the error to be harmless beyond a reasonable doubt. Id. at 789.

[12]The jury in Howell also found a second aggravating circumstance -- the murder was committed during the course of a felony, robbery. Tenn. Code Ann. §39-2-203(i)(7)(1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1998)]. Under Middlebrooks, supra, the jury should not have been permitted to rely upon the felony murder aggravating circumstance to support imposition of the death penalty, but this Court held the error to be harmless beyond a reasonable doubt. Id. at 270.

In <u>State v. Boyd</u>, 797 S.W.2d 589 (Tenn. 1990), the twenty-six-year-old defendant robbed two men at gunpoint in the parking lot of a motel where the men had gone with the defendant's girlfriend and another woman. As in this case, the victim struggled with the defendant for the gun. Losing the struggle for the gun, the victim attempted to drive away from the scene and was then shot several times by the defendant. The jury found the defendant guilty of felony murder and imposed a death sentence upon finding that the defendant was previously convicted of a felony involving violence to the person, including second degree murder. Tenn. Code Ann. § 39-2-203(i)(2) (1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1998)].[13]

In <u>State v. Coleman</u>, 619 S.W.2d 112 (Tenn. 1981), the twenty-two-year-old defendant shot and killed the sixty-nine-year-old victim during the course of a robbery. As in this case, Coleman confessed to the crime. The jury found the defendant guilty of first degree felony murder and imposed a death sentence upon finding that the defendant was previously convicted of one or more felonies which involved the use or threat of violence to the person. Tenn. Code Ann. § 39-2-203(i)(2) (1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(2) (1998 Supp.)].[14] Coleman had one conviction for assault with intent to commit robbery with a deadly

_____

[13]The jury in <u>Boyd</u> also found a second aggravating circumstance, the murder was committed during the course of a felony, robbery. Tenn. Code Ann. §39-2-203(i)(7)(1982 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(7) (1998 Supp.)]. Again, under <u>Middlebrooks</u>, <u>supra</u>, the jury should not have been permitted to rely upon the felony murder aggravating circumstance to support imposition of the death penalty; however, this Court recently held the error to be harmless beyond a reasonable doubt. <u>State v. Boyd</u>, 959 S.W.2d 557 (Tenn. 1998).

[14]The jury in <u>Coleman</u> also found a second aggravating circumstance, the murder was committed during the course of a felony, robbery. Tenn. Code Ann. §39-2-203(i)(7)(1979 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1998)].[Cite to CCA opinion before this decision released depending upon Court's ruling on this application at the March conference).

weapon, three convictions for assault with intent to commit murder in the first degree, kidnapping, and robbery with a deadly weapon.

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the nineteen-year-old defendant killed the victim, a seventy-four-year-old woman during the course of a robbery of a Chinese restaurant. The defendant shot the victim once in the lower jaw or neck region and once in the back of the head. As in this case, the victim was a member of the family which owned the Chinese restaurant that the defendant robbed. The jury found the defendant guilty of first degree felony murder and imposed a sentence of death upon finding two aggravating circumstances. Tenn. Code Ann. § 39-13-204(i)(5) & (12) (1989 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(5) & (12) (Supp. 1998)].

In State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), the twenty-one-year-old defendant was convicted of felony murder. Dicks and his nineteen-year-old co-defendant, Strouth, robbed a store and during the course of the robbery, slit the throat of the seventy-year-old male store clerk who bled to death. The jury imposed a death sentence upon finding two aggravating circumstances. Tenn. Code Ann. § 39-2-203(i)(5) & (7) (1979 Repl.) [currently Tenn. Code Ann. § 39-13-204(i)(5) & (7) (Supp. 1998)]. See also State v. Strouth, 620 S.W.2d 467 (Tenn. 1981) (A separate jury also found Strouth guilty of felony murder and imposed a sentence of death, finding the same two aggravating circumstances.)

In State v. Sample & McKay, 680 S.W.2d 447 (Tenn. 1985), the twenty-five-year-old defendants, in separate trials, were convicted of felony murder for shooting

two store clerks to death during the course of a robbery. As in this case, there was a struggle for the gun during the crime. The jury imposed the death sentence in each case, finding three aggravating circumstances with respect to Sample, and four aggravating circumstances with respect to McKay. Tenn. Code Ann. § 39-2-203(i)(3), (6) & (7) (1982 Repl.)(Sample); Tenn. Code Ann. § 39-2-203((i)(2), (3), (6) & (7) (1982) (McKay) [currently Tenn. Code Ann. § 39-13-204(i)(2), (3), (6) & (7)(1998 Supp.)(both)]. See also State v. Johnson, 762 S.W.2d 110 (Tenn. 1988); State v. Goad, 707 S.W.2d 846 (Tenn. 1986); State v. King, 694 S.W.2d 941 (Tenn. 1985); State v. Johnson, 632 S.W.2d 542 (Tenn. 1982).

As we have emphasized many times, no two cases are identical, but the above cases have many similarities with this appeal. In all nine of the cases, the victims were murdered by the defendant during the course of a robbery or a burglary. Most of the victims were convenience store clerks or were working at a place of business at the time the killing occurred. In three cases, as in this case, there was a struggle for the gun between the defendant and a victim. In at least one case, the defendant claimed that the shooting was accidental. Like the present case, the shootings were completely unprovoked except for the victims' efforts to gain control of the weapons. Also similar to this case, in six of the nine cases, the jury found that the defendant was previously convicted of one or more felonies involving the use or threat of violence to the person. While it is true, as Smith argues, that this murder was not as torturous as other cases in which we have affirmed the death penalty, this fact does not invalidate as disproportionate the penalty imposed in this case. Bland, 958 S.W.2d at 670 (citing cases). Moreover, we acknowledge that there are cases in which a life sentence has been imposed for similar murders or for murders that were

-27-

perhaps more atrocious than the murder in this case.  Id.  Again, however, this does not invalidate as disproportionate the penalty in this case.  Our role in comparative proportionality review is to identify aberrant death sentences.  As we have repeatedly emphasized, the isolated decision of a jury to afford mercy does not render a death sentence disproportionate.[15]  Id.  After reviewing the cases discussed above and many other cases not herein detailed,[16] we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

# IV.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance

---

[15]For example, in examining the Rule 12 reports, we discovered a similar case from Jefferson County, State v. Gene Lynch, in which the jury imposed a life sentence and the trial judge commented on the Rule 12 report that the sentence should have been death.  Lynch waived his right to appeal.  The jury's decision to afford mercy to Lynch does not invalidate Smith's death sentence.

[16]We have reviewed several other cases in which the defendants received a sentence of life imprisonment.  The similar cases in which the State sought the death penalty are distinguishable from this case.  For example, in some of these cases, the defendant was a participant in the robbery and not the person who actually shot the victim.  See e.g. State v. Mona Lisa Watson, C.C.A. No. 24 (Tenn. Crim. App., at Jackson, August 14, 1991); State v. Kevin Watley, C.C.A. No. 37 (Tenn. Crim. App., at Nashville, July 3, 1985).  In another case, the defendant was only seventeen-years-old at the time the murder was committed.  State v. Lemuel Emerson Holmes, C.C.A. No. 50 (Tenn. Crim. App., at Jackson, March 12, 1981).  According to the Rule 12 report, the defendant in still another case chose to present substantial mitigating proof, unlike the defendant in this case.  State v. Lyons, 596 S.W.2d 104 (Tenn. Crim. App. 1979).

outweighed mitigating circumstances beyond a reasonable doubt. We have considered the defendant's assignments of error and determined that none have merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Joe G. Riley, and joined in by Judge Jerry L. Smith and Special Judge Chris Craft. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 11th day of October, 1999, unless otherwise ordered by this Court or other proper authorities.

_____
FRANK F. DROWOTA, III,
JUSTICE

**Concur:**
Anderson, C.J.,
Holder and Barker, JJ.

Birch, J. - See Separate Dissenting Opinion.