# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 8, 2000 Session

## STATE OF TENNESSEE v. MICHAEL D. RIMMER

**Appeal as of Right from the Criminal Court for Shelby County
Nos. 97-02817, 98-01033 & 98-01034    W. Fred Axley, Judge**

---

**No. W1999-00637-CCA-R3-DD  - Filed May 25, 2001**

---

The Defendant appeals his conviction for murder in the first degree and the sentence of death imposed by the jury.[1] This opinion is delivered in two parts, with a separate opinion addressing Part II.

In Part I of this opinion we address the following issues:
  (1)  Admission of evidence regarding his escape attempts;
  (2)  Shackling of his feet and hands;
  (3)  Prohibition of mitigation evidence at sentencing;
  (4)  Admission of his statement to police;
  (5)  Propriety of the prosecutor's closing argument;
  (6)  Unconstitutionality of the death penalty; and
  (7)  Proportionality of sentence of death.
After careful review, we affirm the conviction for murder in the first degree.

In Part II of this opinion, Judge Williams sets forth his minority position on the following issues:
  (1)  Application of the (i)(2) aggravating factor in the imposition of the death penalty;
  and
  (2)  Cumulative effect of errors.
The position of the majority on the issues addressed in Part II is set forth in the separate opinion filed by Judge Witt, in which Judge Hayes has joined.  The majority concludes that the verdict is enigmatic and uncertain, requiring reversal of the sentence of death and re-sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part,
Reversed in Part and Remanded for Re-sentencing**

Part I:
JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, as to Part I, joined by DAVID G.

---

[1] Defendant was also convicted of aggravated robbery and theft of property over $1000 but less than $10,000 in value.  No issues are raised with respect to those convictions or sentences.

HAYES and JAMES CURWOOD WITT, JR., JJ.

Part II:
JAMES CURWOOD WITT, JR., J., delivered the opinion of the court as to Part II, in a separate opinion, joined by DAVID G. HAYES, J. JOHN EVERETT WILLIAMS, J., dissents, which is set forth in Part II of the lead opinion.

Paula Skahan and Gerald Skahan, Memphis, Tennessee, for the defendant, Michael Dale Rimmer.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Tonya G. Miner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas D. Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant, Michael Rimmer, was convicted of premeditated first degree murder by a Shelby County jury on November 7, 1998. In addition to premeditated first degree murder, the jury also found the Defendant guilty of theft of property and aggravated robbery. Extensive circumstantial evidence was presented in this case to prove that the Defendant was the individual who committed these crimes. The victim's body has never been found.

## FACTS

In 1989, the Defendant, Michael Rimmer, was convicted and incarcerated for burglary in the first degree, aggravated assault, and rape of his former girlfriend, who was also the victim in the instant case. While incarcerated at the Northwest Correctional Facility, the Defendant discussed the victim with fellow inmates, William Conaley and Roger Lescure, and threatened to kill the victim. Conaley was a friend of the victim's niece and told her of the Defendant's threats of killing the victim. Lescure worked with the Defendant in the maintenance department and lived in the same unit at the prison. Lescure testified that the Defendant not only threatened to kill the victim, but discussed methods for disposing of a body so that it would not be found.

After the Defendant's release from prison in January 1997, the Defendant secured employment working for an auto body shop. Cheryl Featherston met the Defendant when he came to help her husband do some auto framework at her home. That same month, Featherston reported her maroon 1988 Honda Accord stolen from her driveway. A bent ignition key that her 3-year-old son played with was not seen after the theft.

On February 7, 1997, the victim went to work at her job as a night clerk at the Memphis Inn Motel. Guests of the motel established her presence in the locked front office between 1:00 a.m. and 1:45 a.m. on February 8, 1997. However, in those early morning hours, the victim disappeared from the office. She was never heard from again, and her body has never been found.

The victim checked in guest James Defevere between 1:00 and 1:15 a.m. Guest Natalie Doonan testified that she was in the vending area adjacent to the front office between 1:30 and 1:45 a.m. and saw the victim on duty when a man entered the lobby area. Dr. Ronald King went to the vending area between 1:40 and 1:45 a.m. and witnessed the victim let a man through the locked security door in the office area. The man was driving a maroon automobile. Doonan called the office twenty to thirty minutes after leaving the vending area, but received no answer. When Defevere went to check out between 2:25 and 2:35 a.m., the victim was not in the office. Further, Dixie Roberts Presley and a companion stopped to get a map between 1:30 and 2:00 a.m. Presley saw a maroon car directly in front of the office with its trunk open, which she considered odd since it was raining.

After CSX Railroad management was unable to contact the front desk to wake its crews housed at the Memphis Inn, yardmaster Raymond Summers drove to the motel where he found the victim's office empty and signs of a violent physical struggle. He immediately sought help. Deputies from the Shelby County Sheriff's Department secured the scene and called the Memphis Police.[2]

The crime scene investigation revealed signs of a violent struggle in the employee bathroom, including large amounts of blood, a cracked sink, bloody towels, and a torn off commode seat. A trail of blood led from the bathroom, through the office, and to the curb outside the night entrance. Approximately $600 and several sets of sheets were missing from the office. The victim's billfold and identification were in the office, her car remained in the parking lot, and a ring she constantly wore was on the floor of the bathroom.

Sometime between 8:30 and 9:00 a.m. that morning, the Defendant arrived at his brother's home driving a maroon Honda. Joyce Frazier, his brother's girlfriend, described the Defendant as uncharacteristically dirty. His car and shoes were muddy, and he claimed to have driven into a ditch. The Defendant asked his brother to keep a shovel he was carrying and to help him clean blood from the backseat of the car. After cleaning his shoes in the shower the Defendant asked if he could stay and rest, but his request was denied. The Defendant's brother disposed of the shovel after the Defendant left.

Although his employer considered him to be a good, reliable worker, the Defendant failed to report for work on Monday, February 10, 1997. Nearly one month later, on March 5, 1997, a sheriff's deputy in Johnson County, Indiana, stopped the Defendant for speeding. A check of the license plate and driver's identification revealed that the car was Featherston's stolen maroon Honda and that the Defendant was wanted in Tennessee for questioning in conjunction with the victim's disappearance and suspected murder.

---

[2] Memphis Inn is located inside Memphis city limits which gave the city police jurisdiction over the investigation.

An inventory of the car yielded receipts that evidenced the Defendant's cross-country flight after the victim's murder. Until his arrest, he traveled through Mississippi, Florida, Missouri, Wyoming, Montana, California, Arizona, Texas, and Indiana. Also found were large blood stains in the car's back seat. DNA testing proved the blood was consistent with female offspring of the victim's mother. Additional testing revealed that blood from the crime scene and the car contained DNA that was consistent with the victim's.

While jailed in Indiana, the Defendant agreed to be questioned by officers from the Memphis Police Department. In the course of the questioning, the Defendant claimed to have been at a topless club in Memphis on the night of the victim's disappearance, that he left the club at about 3:00 a.m. and headed for Mississippi but was too tired to finish the drive, that the car he was driving got stuck in mud on the median and required rocking to get out, that he slept at a rest stop until about 8:00 a.m., after which he went to Arkabutla Lake, and then to his brother's house. The Defendant claimed that he didn't know anything about the victim's disappearance, but speculated that she went to visit her mother in Mississippi. In response to the officers' claim that the victim might be dead, the Defendant responded that she could not be dead because the police did not have a body.

The Defendant's Indiana cell mate, James Allard, Jr., testified that the Defendant told him about killing his wife in a room behind the service desk at the motel where she worked. The Defendant described the scene as very bloody, described the location where he dumped the body, and expressed surprise that officials had not yet located it.

The Defendant participated in at least three escape attempts after his arrest. The first involved using toe-nail clippers to cut an opening in the recreation yard fence at the Johnson County, Indiana jail. The Defendant discussed this attempt with Allard and enumerated plans which included the possibility of taking a guard hostage or killing a guard to get out. Two "shanks," or homemade knives, were found in the defendant's Indiana cell. In his second attempt, the Defendant seized control of a prisoner transport van. After a chase of approximately twenty miles, Bowling Green, Ohio police were able to stop the van and apprehend the Defendant who had a shotgun, shells and beer in the van. The third attempt occurred at the Shelby County jail where the Defendant and another inmate sawed through the bars of their cell, broke out a window, and used a homemade rope to climb down.

As a result of the Defendant's escape attempts and the discovery of potential weapons on his person prior to trial, the trial court ordered that the Defendant's legs be shackled while in the courtroom. After his conviction and the discovery of a book with a handcuff key impression and a drawing of handcuff mechanics, the court also ordered that handcuffs be placed on the Defendant's wrists at sentencing.

At sentencing, the State offered two witnesses: the victim's mother who gave limited victim impact evidence and the criminal court clerk who gave proof of the defendant's prior convictions involving violence against the person. Over his counsel's objection, and in spite of the trial court's warning, the Defendant opted to present no mitigating evidence. Upon receiving the jury's verdict,

the trial court concluded that the jury found that the Defendant had prior convictions involving violence to the person and that the aggravating circumstances outweighed any mitigating factors. A sentence of death was imposed.[3]

## ANALYSIS

## Part I

### 1. EVIDENCE OF ESCAPE ATTEMPTS

The Defendant argues that the trial court erred by allowing the State to present evidence of his escape attempts to the jury. The Defendant contends that this evidence was overly prejudicial and should not have been introduced at the guilt phase of his trial. The Defendant argues that our analysis of this error must be conducted in light of the heightened reliability requirements in capital case decisions pursuant to the Eighth Amendment. The State argues that the trial court did not abuse its discretion and that there is no precedent for this court to substitute its judgment for the trial court's on this issue.

The State maintains that case law and a plain reading of Tennessee Rules of Evidence 401 and 403 establish the relevance of the escape evidence and the trial court's authority to admit such evidence at its discretion. See generally Tenn. R. Evid. 401; Craig v. State, 455 S.W.2d 190 (Tenn. Crim. App. 1970) ("[f]act that a substantial period of time has elapsed between the beginning of the custody and the . . . attempted escape does not render evidence . . . too remote, and escape from custody may be shown even though the prosecution has introduced evidence to show the flight of accused prior to the time he was taken into custody"). The State also challenges the assertion that evidence of the Defendant's escape attempts should have been excluded under Tenn. R. Evid. 403 as unduly prejudicial since nothing about the presented evidence would establish unfair prejudice.

In rebuttal, the Defendant claims not to challenge the relevancy of the proffered evidence, only its probative value, which was modest in comparison to the evidence of his flight immediately after the crime. More importantly, the Defendant argues that due to the nature and extent of the escape evidence, its probative value was far outweighed by its prejudicial effect and that the trial court erred by admitting it.

The State's introduction of evidence as related to the Defendant's multiple escape attempts was intended to demonstrate consciousness of guilt associated with evidence of flight. The evidence introduced included testimony and physical evidence. The Defendant's Indiana cell mate testified regarding plans and actions taken by the Defendant at the Johnson County jail. An officer testified that he found two shanks hidden in the Defendant's Indiana cell. The Bowling Green, Ohio officer

---

[3] The trial court's interpretation of the jury's verdict will be discussed in Part II of this opinion.

who apprehended the Defendant in the prisoner transport van testified about a shotgun and ammunition found in the van. Two jailers testified about the Defendant's attempt to climb out the window at the Shelby County jail using a homemade rope; the rope, the sawed-through cell bars, and the homemade pick that was used to break the window at the Shelby County jail were introduced into evidence. The Defendant claims that the prejudicial effect of this evidence significantly outweighed its probative value, especially when compared to the evidence of his cross-country journey immediately following the crime.

The trial court addressed the Defendant's objections to the evidence as they arose during the course of trial. It concluded that the stated purpose of introducing the evidence was proper and that its probative value was not outweighed by its prejudicial effect. The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be given to the evidence, and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The trial court did not abuse its discretion and this issue is without merit.

## 2.  SHACKLED FEET & HANDS

The Defendant contends that the trial court erred by ordering that he wear leg restraints during the course of trial and both handcuffs and leg restraints during the sentencing proceedings. The State argues that the trial court properly restrained the Defendant and that under the circumstances it did not inherently violate the Defendant's constitutional rights.

A.  Leg Restraints

The Defendant argues that he had a right to appear before the jury free from restraints. LaFave et al., Criminal Procedure § 24.2(e) (1999). The Defendant further claims that the trial court erred by failing to conduct a hearing to show extreme need, by failing to provide a sufficient reason to justify the restraints, and by failing to instruct the jury that shackling should not affect its determination of guilt or innocence or its assessment of punishment. See Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976); Raybin, Tennessee Criminal Practice and Procedure § 24.55. The Defendant also contends that the trial court's actions were so grossly prejudicial as to be harmful beyond a reasonable doubt. By contrast, the State argues that the trial court made its decision to shackle the Defendant in accordance with the procedural safeguards established by Willocks and that the record demonstrates that the use of restraints was reasonably necessary.

The Willocks court held that in-court shackling is inherently prejudicial but also concluded: (1) a defendant may be shackled in the trial court's discretion to prevent his escape; (2) a hearing should be conducted to determine whether physical restraint is necessary to prevent the escape of that particular defendant or whether less drastic security measures will suffice; and (3) when physical restraint is used, the jury must be given an instruction that shackling should in no way affect their determination of guilt or innocence or their assessment of punishment. 546 S.W.2d at 821-22. Under these guidelines, this court must determine whether the trial court clearly abused its discretion in permitting the Defendant to be shackled before the jury.

-6-

Prior to the start of evidence, the trial court heard arguments regarding the placement of leg restraints on the Defendant. The record reveals that the courtroom was very small and provided little space between the Defendant and other parties (i.e. jurors, spectators, etc.). The Defendant was dressed in civilian clothes and the leather restraints were placed around his ankles. He sat behind a set of tables which obstructed the jurors' view of his legs. In deciding that restraints were appropriate, the trial court stated, "From the second row in the jury box, even on the far end toward the defendant, [the restraints] can't be seen .... [T]he legal presumption [that restraints should not be used has] been overcome." The trial court also noted that two potential weapons were taken from the Defendant's person just minutes before being brought into the courtroom.

During the course of jury voir dire, the Defendant again raised the issue of the leg restraints. He claimed that two potential jurors seemed to be looking at the restraints. The trial court found that the defense table obstructed the jurors' views of the Defendant's ankles. Furthermore, the record indicates that the trial court ensured that the Defendant was only moved around the courtroom outside the jury's presence.

Given the Defendant's attempted escapes following his arrest and his attempt to arm himself, it is clear that the trial court did not abuse its discretion in permitting limited physical restraint of the Defendant. See Id.; see also State v. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978 (Tenn. Crim. App. filed May 26, 2000, at Jackson) (no abuse of discretion when a trial court restrains a defendant where "necessary to prevent escapes, violence or misconduct which would impede the trial"). As argued by the State, the trial court used the least obtrusive means to ensure courtroom safety without using more noticeable and prejudicial safeguards. Furthermore, the trial court's finding that the jury could not see the Defendant's leg restraints obviated the need for a jury instruction which would have operated to the Defendant's detriment by calling attention to the physical restraints during trial.

B.      Hand Restraints

The Defendant also contends that the trial court erred when it ordered the Defendant to be handcuffed at the sentencing phase of trial. The State argues that the jury conviction removed the presumption of innocence and that the Defendant failed to support his assertion that the additional restraint violated his due process rights. In the event this court finds that the trial court erred, we are urged to conduct a harmless error analysis.

A guilty verdict removes the presumption of innocence which the Defendant enjoyed at trial. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Nevertheless, the Defendant cites to Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir. 1995) for the proposition that the trial court erred by allowing physical restraints at sentencing:

> In the penalty phase of a capital trial, the jury knows the defendant is a convicted felon. But the extent to which he continues to be dangerous is a central issue . . .

physical restraints may create the impression in the minds of the jury that the court believes the defendant is a particularly dangerous and violent person. Therefore, in the absence of a compelling need to shackle the defendant during his sentencing hearing, such a practice is inherently prejudicial.

Id.

Even assuming that the restraints placed on the Defendant were prejudicial, the record reveals a compelling need for the restraints. On the second day of trial, the Defendant attacked one of the State's witnesses in the jail in retaliation for having testified against him. On the third day of trial, a self-help litigation manual with an impression of a handcuff key and drawings of handcuff mechanics was removed from the Defendant's person.

Clearly, the Defendant posed a danger to courtroom security. He attempted several escapes prior to trial; he attempted to arm himself in the courtroom; he attacked a witness against him in the jail; and he obtained materials to attempt to free himself from his hand restraints. The trial court was justified in placing the additional restraints on the Defendant for the sentencing phase. This court must also note that the record reflects that the trial court arranged for the Defendant's hands to be restrained in front, rather than behind his back, which made his hands easier to conceal without drawing the jury's attention to the restraints.

### 3. PROHIBITION OF MITIGATION EVIDENCE AT SENTENCING

Over the objection of defense counsel, the trial court allowed the Defendant to prohibit the presentation of additional mitigation evidence to the jury at sentencing. While acknowledging the recent ruling that a Defendant has the right to decide whether to present mitigating evidence, see Zagorski v. State, 983 S.W.2d 654, 660-61 (Tenn. 1998), he asserts that the trial court's procedure was inadequate to ensure that he was competent and fully informed of the consequences of his decision. The State argues that, despite the penalty phase occurring before the filing of the opinion in Zagorski, the trial court substantially complied with its stated procedure for ensuring a knowing and voluntary waiver of that right. See State v. Smith, 993 S.W.2d 6, 13 (Tenn. 1999).

When faced with a criminal defendant who desires to forego the presentation of mitigating evidence, Zagorski requires the trial court to: (1) inform the defendant of his right to present mitigating evidence and make a determination that the defendant understands this right and the importance of such evidence; (2) question whether the defendant and counsel have discussed the importance of mitigation evidence and the risks of not presenting such; and (3) after ensuring that the defendant understands the importance of mitigation, inquire whether he still wishes to forego such presentation. 983 S.W.2d at 660-61.

At sentencing, the Defendant made a pro se motion to waive jury sentencing and defense counsel advised the court that the Defendant also wished to waive further presentation of mitigating evidence. The Defendant was placed under oath and questioned regarding these requests. There was no suggestion that the Defendant was incompetent to understand the possible consequences of his

request, and the trial court noted the Defendant's intellect.

The trial court questioned whether counsel advised the Defendant regarding the potentially devastating consequences of failing to present mitigating evidence. Counsel indicated that he had advised the Defendant, and the Defendant indicated he understood the risks of waiving his right and did so of his own volition. When the defense made an offer of proof by their mitigation specialist, the Defendant again expressed his desire to forego mitigation by strenuously objecting to the offer of proof. At the close of the State's proof, the trial court offered the Defendant an opportunity to change his mind. The Defendant responded that he did not wish to change his mind, that no one pressured him into the decision, and that the decision was his own.

The trial court correctly determined that the Defendant was competent to execute a waiver of his right to present mitigating evidence, see Smith, 993 S.W.2d at 13, and substantially complied with the requirements established by Zagorski. The Defendant's claim that the trial court's "blind deference" to his wishes amounted to constitutional error is without merit.

### 4. ADMISSION OF DEFENDANT'S STATEMENT

Memphis police interviewed the Defendant after his arrest in Johnson County, Indiana, at which time he made an arguably inculpatory statement regarding the absence of the victim's body.[4] During the course of Sergeant William Ashton's examination at trial, it became apparent that a page of the Defendant's statement was omitted inadvertently from the defense's copy of the statement. As a result of this discovery violation, the trial court excluded the Defendant's statement and instructed the jury to disregard the officer's testimony. However, on the basis of the defense's cross-examination regarding the length of the interrogation, the trial court reversed itself and allowed the State to re-introduce the content of the Defendant's statement.

The Defendant claims that the State committed a discovery violation that required exclusion of the evidence at issue. Raybin, Tennessee Criminal Practice and Procedure § 13.92 (most effective remedy for discovery violation is exclusion of evidence). He argues that the inculpatory statement was the only direct evidence against him, other than an alleged jailhouse confession, and that its initial exclusion by the trial court was proper. By contrast, he asserts that the trial court's subsequent reversal was "inexplicable and indefensible."

The State argues that the statement should not have been excluded in the first place, given its predominantly exculpatory nature, and since the only arguably inculpatory portion of the Defendant's comment was that the victim could not be dead since the police had no body. Further, the State also argued that it was not error for the trial court to admit the statement on re-direct after it found that the defense "opened the door" during cross-examination.

---

[4] Apparently, upon questioning by the officers as to the victim's whereabouts, the Defendant commented that the victim could not be dead because the police did not have a body, a fact which the officers did not mention to the Defendant.

The record clearly sets forth that the prosecution failed to provide the Defendant with a copy of his statement when requested during discovery. The record also shows that it was not until the statement was introduced at trial that the defense counsel learned of the statement. As such, we agree that the Defendant's statement should have initially been excluded since it was not provided to the Defendant when requested during discovery. See Tenn. R. Crim. P. 16(a)(1) & (d)(2). We note, that while the court had not yet ruled on this matter at the time the jury heard the statement that the Defendant made to the police, the trial court told the jury that the only testimony they could consider during deliberations was that on March 6th the police went to Franklin, Indiana, and when they arrived they saw the Defendant and advised him of his rights. The trial court then told the jury that "[i]f during deliberations someone raises the issues about anything else, you must remind them, they can't consider anything else." There is nothing in the record to suggest that the jury did not follow the curative instruction given by the trial court.

As set forth above, it later became proper for the trial court to allow the jury to consider the statement the Defendant gave to the police. Following the trial court's curative instruction to the jury, the defense cross-examined the officer who testified about the Defendant's statement. During cross-examination, the defense asked the officer whether he recorded the Defendant by audiotape or videotape, or took notes during the interview. When the defense counsel later conducted re-cross, the officer was told to "refer back to [his] supplement" to answer questions asked of him by defense counsel. When defense counsel instructed the officer to use his notes containing the Defendant's statement to the police to answer questions, the defense counsel opened the door for the full statement contained within those notes to be read into the record. See State v. Jones, 15 S.W.3d 896 (Tenn. Crim. App. 2000). The trial court did not err by allowing the Defendant's statements to be heard and considered by the jury once defense counsel opened the door.[5]

This court further examined this issue under the doctrine of curative admissibility. Under this doctrine, "'where a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects'." State v. Land, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (citations omitted). "In other words, 'if A opens up an issue and B will be prejudiced unless B can introduce contradictory or explanatory evidence, then B will be permitted to introduce such evidence, even though it might otherwise be improper.'" Id. (quoting People v. Manning, 695 N.E.2d 423, 433 (Ill. 1998) (citations omitted)).

The rule is derived form the fundamental guarantee of fairness.... "[This] rule operates to prevent an accused from successfully gaining exclusion of inadmissable prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government being able to place them in their proper context." Lampkins v. United States, 515 A.2d 428, 431 (D.C. 1986). However, it "is limited

---

[5] But for the discovery violation exclusion, this evidence would have been clearly admissible.

-10-

> by the necessity of removing prejudice in the interest of fairness." <u>Crawford v.</u>
> <u>United States</u>, 198 F.2d 976, 979 (D.C. Cir. 1952)

<u>Id</u>. The trial court must proceed with caution, however, as the evidence permitted to be introduced is limited to that "which is necessary to dispel the unfair prejudice." <u>Id</u>. Finally, the court must weigh the good that is derived from evidence that is to be used to correct the negative inference against the harm that is likely to occur from the use of the excluded evidence. <u>Id</u>.; <u>see also</u> 27 Fed. Prac. & Proc. Evid. § 6096 (1990).

This court is of the opinion that when the defense began to question the officer about the duration of the Defendant's interview, whether a video or audio tape was made of the interview, and whether he took notes during the interview, the defense entered into an area that the prosecution was prohibited from entering into by the trial court. It is inarguable that when defense counsel began to solicit testimony from the officer that was directly related to the evidence the prosecution was prohibited from using the defense was "extracting selected pieces of evidence for its own advantage." The questions posed by defense counsel attempted to create the appearance that the police interviewed the Defendant for four and a half hours and walked away from the interview with nothing to show for the lengthy period of interrogation. This is precisely the scenario that the doctrine of curative admissibility was intended to rectify by allowing otherwise inadmissible evidence to be used in order to cure the negative inference that was unleashed when the defense proceeded with its line of questioning.

This court must now address whether the harm that resulted from allowing the Defendant's statement to be considered by the jury outweighed the good that resulted from it. The prosecution points out that the statement given to the police by the Defendant was primarily an alibi statement. We agree and do not find that the overall statement caused any harm to the Defendant. This court is not convinced, however, that there was no harm at all in allowing the Defendant's statement to be considered by the jury. Therefore, we must focus our attention on those areas that are potentially harmful to the Defendant; specifically, the Defendant's statement that the victims could not be dead because the police did not have a body and the fact that the police had not yet told the Defendant that they did not have a body.

We first turn our attention to the harm that was caused by allowing these two pieces of evidence to be heard by the jury. At the time the potentially harmful portion of the Defendant's statement was heard by the jury, a vast quantity of damaging testimony had already been given by several different witnesses. Specifically, testimony was given that the Defendant had made death threats concerning the victim on past occasions; that the Defendant had past convictions for violence against the victim (i.e. aggravated assault and rape); that the Defendant stole a maroon Honda automobile; that the victim was killed between 1:30 a.m. and 3:10 a.m. on the morning of February 8, 1997, and that during the time period in which the victim was killed, the maroon Honda automobile stolen by the Defendant was seen in front of the motel where the victim worked; that a large amount of blood was found at the victim's work place; that around 9:00 a.m. on the morning the victim was killed the Defendant arrived at his brother's house in a maroon Honda automobile;

that the Defendant's shoes were muddy; that the car was muddy, and that there was a shovel in the back of the car; that the Defendant asked his brother to help him clean some blood out of the back of the car; that the Defendant was arrested in Indiana in the stolen maroon Honda automobile, and that there was a large reddish-brown stain in the back seat that looked like a dried blood stain; and that the victim's family never saw the victim again after she left for work during the late hours of February 7, 1997.

The testimony set forth above clearly painted a damaging picture well before the Defendant's statement was allowed into evidence by the trial court. The Defendant's statement only served to support the damage that was already done by the testimony that had already been given by several witnesses. As such, we believe that the portion of the Defendant's statement that was potentially harmful was minimally harmful.

We now turn our attention in this balancing analysis to the good that came from allowing the jury to hear the Defendant's statement. Time and time again this court has excluded evidence that has tended to mislead the jury. Such exclusionary practices by this court are evidence of the great lengths we go to in order to ensure that our juries are not mislead by evidence presented to them at trial. The flip side of the coin is the importance of correcting evidence that has tended to mislead or has the potential of misleading the jury. As set forth above, the line of questioning engaged in by the defense had the tendency or potential to mislead the jury. Thus, we find that there was clearly a much greater good in allowing the Defendant's statement to be considered by the jury in order to correct the misleading portrait the defense counsel attempted to paint for the jury.

Under the doctrine of curative admissibility, the Defendant's statement would have been proper. The harm associated with admitting the Defendant's statement did not outweigh the good that was derived from allowing it into evidence. This issue is without merit.

## 5. PROSECUTOR'S CLOSING ARGUMENT

In his closing argument, the prosecutor conducted a long narrative encompassing such issues as the Defendant's cross-country flight following the murder and the victim's body lying in an unmarked grave. The Defendant avers that the argument was blatantly improper in that it was intended to appeal to the sympathy, prejudice and emotion of the jury. He asks this court to find plain error in the trial court's failure to undertake curative measures. The State claims that the argument was entirely proper in light of the evidence presented at trial and that Defendant's rights were not violated by the prosecutor.

Generally, the scope of a closing argument is subject to the trial court's discretion. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The parties should be granted wide latitude provided the argument is "temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Id.; State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Nothing about the prosecutor's closing argument violated these principles. This issue is without merit.

## 6. ILLEGALITY AND UNCONSTITUTIONALITY OF DEATH PENALTY STATUTE

While acknowledging the determination of the issues, the Defendant preserves the following statute constitutionality issues for subsequent review:[6]

(1) The statute fails to meaningfully narrow the class of death eligible defendants (challenging (i)(2), (5), (6) & (7) aggravating circumstances);

(2) The prosecutor's unlimited discretion in deciding to seek the death penalty;

(3) The discriminatory imposition of the death penalty based upon economics, race, geography and gender;

(4) The lack of uniform procedures for jury selection in capital cases (i.e., no requirement of individual voir dire);

(5) The effect of a death qualification process that results in a prosecution-prone, guilt-prone jury;

(6) The lack of opportunity to address popular misconceptions about sentencing (i.e., relative costs of incarceration and execution; deterrent effect);

(7) The jury instructions requiring a unanimous verdict to impose a life sentence and prohibiting instruction on the effect of a non-unanimous verdict;

(8) The effect of Tenn. Code Ann. §39-13-204(g) that the jury is not required to make the ultimate determination that death is appropriate penalty;

(9) The denial of final closing argument at sentencing; and

(10) The constitutionally inadequate appellate review process.

The State correctly asserts that this same litany of claims has been previously rejected by the State's appellate courts. See State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), cert denied,119 S. Ct. 1359 (1999); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), cert. denied, 119 S. Ct. 343 (1998); State v. Mann, 959 S.W.2d 503 (Tenn. 1997), cert. denied, 118 S.Ct. 2376 (1998).

## 7. PROPORTIONALITY REVIEW Tenn. Code Ann. § 39-13-206(c)(1)

The Defendant claims that considering the nature of the crime and legal precedents, the sentence of death in his case is excessive and disproportionate. The State disagrees and contends that the Defendant's trial was conducted pursuant to statutory procedures and that the sentence was not imposed arbitrarily.[7]

---

[6] The State contests the Defendant's standing to challenge the (i)(5), (6) & (7) aggravators since he was not subjected to their application. Nevertheless, the constitutionality of these provisions are addressed in State v. Vann, 976 S.W.2d 93, 110 (Tenn. 1998).

[7] As discussed in Part II below and in the separate opinion of Judge Witt and joined by Judge Hayes, the majority holds that due to errors in the sentencing phase of the trial, the defendant must receive a new sentencing hearing. However, it is the duty of this court to address all appellate issues, due to the possibility of further appeal of our decision. See, e.g., State v. Pendergrass, 13 S.W.2d 389, 395 (Tenn. Crim. App. 1999).

According to the Defendant, in cases where no body was found, common law courts refused to convict for capital murder to assure that a homicide was actually committed.  He argues that we should refuse to execute a man without the same assurance.  Specifically, he claims that the lack of a body and/or an eyewitness to the crime prevents a proper proportionality review by this court as required by State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997).  He seeks to have this court set aside the death sentence and impose a life sentence.

Tennessee Code Annotated section 39-13-206 provides that the court reviewing the imposition of a death sentence must determine whether (1) it was imposed in an arbitrary fashion; (2) the evidence supports jury's finding of statutory aggravating circumstances; (3) the evidence supports the jury's finding that aggravating circumstances outweigh the mitigators; and (4) the sentence is not excessive or disproportionate to penalties imposed in similar cases considering the nature of crime and the defendant.  Tenn. Code Ann. § 39-13-206.  The purpose of a comparative proportionality review is "to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty."  Bland, 958 S.W.2d at 665.

In comparing similar cases, we consider such factors as (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims.  Id. at 667.

In comparing defendants, we consider (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation.  Id.

Evidence at trial revealed that the victim, the Defendant's former girlfriend, suffered a violent death given the huge amount of blood in the bathroom and the broken bathroom fixtures; that the Defendant harbored a strong desire for revenge against the victim; and that the murder occurred during perpetration of a robbery wherein $600 and several sets of sheets were stolen from the victim's place of business.  Testimony also established a continuing obsession and hatred for the victim, which undoubtedly factored into the robbery of the establishment where the victim worked and was a prime factor in the victim's murder.

At sentencing the jury received conclusive, undisputed evidence of the Defendant's convictions for prior violent felonies.  The Defendant refused to allow counsel to present any mitigating evidence, and instead forced counsel to rely on evidence presented at trial for mitigation purposes.  Such evidence was extremely limited and weak.  Further, the jury was aware that the victim's body was never recovered and was free to consider that as a mitigating factor.

-14-

The Defendant, who was 31 years old at the time he committed the murder in the instant case, has a criminal record consisting of convictions for rape, two counts of aggravated assault, and assault with intent to commit robbery with a deadly weapon. With regards to the Defendant's mental or emotional history, there is no evidence in the record to support such a showing. Further, the Defendant showed no remorse at the trial or sentencing hearing, and never revealed the location of the victim's body. The Defendant's refusal to divulge the location of victim's body is callous in this court's opinion, and in choosing to withhold such information, the Defendant has done much more than commit murder in this case. Indeed, his refusal to divulge the location of the victim's body effectively perpetrates on the victim's family a never-ending victimization. The Defendant's refusal to give closure to the victim's family, instead choosing to hide behind lies set forth in his idle claims of innocence, obviously demonstrated to the jury the cold, heartless nature of the Defendant.

Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with the instant case. See State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (the murder of a store owner during a robbery, with similar aggravating circumstances); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (the murder of a woman during the burglary of her home, with similar aggravating circumstances); State v. Hodges, 944 S.W.2d 346 (Tenn. 1997) (the murder of a man in his home after he was robbed, with similar aggravating circumstances); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (the murder of a man in his home during an armed robbery, with similar aggravating circumstances); State v. Goad, 707 S.W.2d 846 (Tenn. 1986) (the murder of a store merchant during an armed robbery, with similar aggravating circumstances); State v. Buck, 670 S.W.2d 600 (Tenn. 1984) (the murder of a woman working as a clerk at a self serve gas station after she was kidnaped and raped, with similar aggravating circumstances).

In accordance with Tennessee Code Annotated § 39-13-206(c) and the principles adopted in prior decisions, this court has reviewed the entire record, giving due weight and consideration as mandated. After an in-depth and thorough review, we conclude that the Defendant's sentence of death is not arbitrary or disproportionate to sentences imposed in similar cases considering the nature of the crime and the Defendant. Further, the evidence supports the jury's findings of the statutory aggravating circumstances that gave rise to and warranted the imposition of a sentence of death in this case. While the facts of the instant case are not identical to the facts in the cases set forth above, the cases set forth in the proportionality review demonstrate that the sentence of death in the instant is not aberrant.

A sentence of death is not disproportionate unless, taken as whole, the case plainly lacks circumstances consistent with those in cases where death is imposed. Bland, 958 S.W.2d at 665. Hence, the fact that no body was recovered does not preclude the imposition of the death penalty, and meaningful appellate review of the sentence was accomplished in spite of the absence of a body. The record shows that the trial in this case was conducted according to all statutory mandates. The sentence was not imposed arbitrarily, and the evidence supported the jury's application of the (i)(2) & (7) statutory aggravating circumstances. There have been numerous cases in which the death penalty was imposed based on the application of the (i)(2) & (7) aggravating circumstances. Furthermore, the record supports a finding that the aggravating circumstances outweighed the

mitigating factors highlighted by defense counsel during the guilt phase of trial. This issue is without merit.

## Part II

### (Minority Position of Judge Williams)

This section addresses the defendant's issues relative to the sentencing phase of the trial and his complaint of cumulative error. The majority of the panel concludes that prejudicial errors occurred in the sentencing phase of the trial which require that this case be reversed and remanded for a new sentencing hearing. The views of the majority are expressed in a separate opinion authored by Judge Witt and joined by Judge Hayes. However, the author of this lead opinion disagrees with the majority's conclusions, and as set forth below, would affirm the sentence of death.

### 1. AGGRAVATING FACTOR § 39-13-204 (i)(2)

I have concluded that the jury verdict reflects two statutory aggravating circumstances, (i)(2) and (i)(7), and their verdict of death should be affirmed.

The evidence of guilt is overwhelming. Although the defense attempts to raise doubts about the death of the victim due to the fact that the body has not been found, I conclude the jury had before it sufficient evidence about the crime scene, the amount of blood found, the medical testimony, the DNA testimony, and the testimony from the defendant's brother to conclude beyond a reasonable doubt that the defendant brutally murdered the victim and buried her with the shovel that the defendant's brother destroyed at the defendant's request.

The evidence of aggravating circumstances is also overwhelming.

The State confined its argument during the sentencing phase to facts and circumstances appropriate for the jury's consideration in finding the statutory aggravating circumstances.

> MS. MOSLEY: Let's talk about some of those aggravators. 1985, this man committed yet another aggravated assault before he ever knew Ricci. Pled guilty to it. Is there any reasonable doubt about that? No.
>
> Assault with the intent to commit robbery with a deadly weapon. Another aggravator. Any doubt at all about that? He pled guilty to it. No.
>
> Let's remember Ricci, the aggravated assault against her in 1989 or '88. Again, he pled guilty to that. Is there any doubt about that?
>
> How about that rape? Another one. Pled guilty to. Is there any doubt about that? No.

-16-

Another aggravator that you can consider, and these are all outlined by law, is the fact that this crime, this murder, this brutal death of Ricci Ellsworth was committed while he committed another felony that other robbery. You can consider that as yet another aggravator. Again, there's no doubt about that. You've already found him guilty of that. You've found him guilty of that murder and you found him guilty of that robbery. Those are all aggravators that you can consider. And there is no doubt about any of them.

The burden when it comes to aggravators and mitigators is on us, the State. We have to prove the aggravators beyond a reasonable doubt, and we have to prove to you that they outweigh any mitigation that the Defense might offer beyond a reasonable doubt.

The defendant did not desire to put on any mitigating testimony during the sentencing phase. The trial court found this was a knowing and intelligent waiver. Therefore, the closing argument of the defendant's counsel during the sentencing phase consisted of two pages of transcript, which focused primarily upon the mitigating evidence, however minimal, that was available for the jury to consider. Defense counsel also focused on the State's burden of proving beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

The State, in rebuttal to defense counsel's argument about mitigating evidence, said:

MR. HENDERSON: If so, how much weight do you give that compared to four prior violent convictions, two separate times of guilty pleas, one in '85, one in '88. Four-time loser. And we're to balance that against the fact that for two weeks he was a good and reliable worker.

. . .

We do have a lot of aggravating factors. The fact is [this murder] was done during the perpetration of a felony, robbery. The fact that he has a prior conviction for assaulting someone with the intent to commit robbery with a deadly weapon. The fact that he's committed two different aggravated assaults and a rape.

The trial court then charged the jury as follows as relates to the statutory aggravating circumstance:

Tennessee law provides that no sentence of death or sentence of imprisonment for life without possibility of parole shall be imposed by a jury but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which shall be limited to the following:

-17-

1. The defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crime of Assault to Rob in indictment #85-0048, Aggravated Assault in indictment #85-00449, Aggravated Assault in indictment #89-02737 and Rape in indictment #89-02738, which are felonies involving the use of violence to the person.

2. The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery.

The jury was provided with three verdict forms and returned the following, signed by all members:

(1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

(Here list the statutory aggravating circumstance or circumstances so found, which <u>must be limited</u> to those enumerated for your consideration by the court in these instructions.)

<u>Guilty of murder in the 1st degree, aggravated assault with intent to commit robbery, theft Nov. 7, 1998; 1st degree Burglary, aggravated assault, and rape - June 6, 1989; and assault with intent to commit robbery with a deadly weapon and aggravated assault, June 10, 1985</u>

(2) We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances so listed above outweigh any mitigating circumstances.

(3) Therefore, we, the jury, unanimously find that the punishment for the defendant, <u>Michael Dale Rimmer</u>, shall be death.

I conclude that the jury, by listing Guilty of murder in the first degree, aggravated assault with intent to commit robbery, theft November 7, 1998, found the (i)(7) statutory aggravating circumstance: that the murder was committed during the perpetration of a felony. The inclusion of the theft is surplus and harmless beyond a reasonable doubt.

The remaining list of felonies, I conclude, establish the (i)(2) statutory aggravating circumstance: prior felony convictions. The listing of the first degree burglary was surplus and harmless beyond a reasonable doubt. During the guilt phase, the jury was made aware that this burglary involved violence. Indeed, it was during this burglary that the defendant raped and assaulted the victim in 1989. Further, defense counsel did not object to the jury considering the first

-18-

degree burglary conviction during the sentencing phase when they requested Exhibit Number 41, which contained a copy of the conviction judgments for the defendant's 1989 convictions of first degree burglary, aggravated assault and rape, to be delivered to the jury room.

I express concern over the verdict form that juries across this state are asked to use. Not every jury recognizes what information a reviewing court would like for them to include in the four blank lines they are given. For instance, had the jury in this case wished to write verbatim the statutory aggravating circumstances, they would have found inadequate space exists on the form to accomplish such a task. I think it would be a rare case for any citizen of this state to be asked to consider a death verdict more than once in their life, which clearly explains their unfamiliarity with what is expected of them.

I agree with the majority that the trial judge has the duty and the power to assure the jury reports a proper verdict.

## 2. CUMULATIVE EFFECT OF ERRORS

The Defendant argues that the heightened reliability requirements of Eighth Amendment jurisprudence mandates that all errors in the penalty phase of capital proceedings be considered cumulatively under a constitutional harmless error standard. He frames the issue as: Can it be said beyond a reasonable doubt that the errors had no effect on the jury's weighing process?

The Defendant claims that harmless error should rarely be found in the sentencing phase of a capital case due to the difficulty in assessing the effect of any error on the jury's decision to return a death sentence. He characterizes the Court's review of a capital sentence as an appellate court's highest moral calling, requiring the Court to be honest about what can and cannot be achieved through the review process. Due to the heightened reliability requirements and the "value-based" nature of death penalty decisions, the Court should be reluctant to affirm the imposition of a death sentence where there have been multiple errors.

The Defendant maintains that it is impossible to conclude beyond a reasonable doubt that the numerous penalty phase errors did not enter into the jury's evaluation when it imposed the death penalty. Therefore, the sentence should either be set aside or reversed and remanded for a new sentencing hearing.

The State asserts that a death penalty case does not require a different cumulative error standard and that combining errors would not require a different result. Herrera v. Collins, 113 S. Ct. 853, 863 (1993) (refusing to apply different standard of review on federal habeas corpus cases involving death sentences). The Defendant challenges the applicability of Herrera since it was a habeas corpus case and did not indicate that increased reliability dictated by the Eighth Amendment should not be applied to cumulative error analysis as well.

Having found no errors in the issues raised by the Defendant, this court need not address whether or not there should be a higher standard for cumulative errors in a capital case.

For reasons set forth above, and after completing my review as required under Tennessee Code Annotated section 39-13-206(c)(1), I conclude that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances, and that the sentence of death is not disproportionate to the penalty imposed in similar cases. Accordingly, I would affirm the jury verdict of death.

## CONCLUSION

Therefore, we affirm the conviction for murder in the first degree, however, for the reasons set forth in the separate opinion of Judge Witt and joined by Judge Hayes, we reverse the sentence of death and remand this case for re-sentencing.

_____
JOHN EVERETT WILLIAMS, JUDGE