# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 6, 2009 Session

## STATE OF TENNESSEE v. DEANGELO DAVIS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-02319     W. Otis Higgs, Jr., Judge**

**No. W2008-00992-CCA-R3-CD  - Filed June 26, 2009**

The defendant, Deangelo Davis, was convicted by a Shelby County jury of criminal attempt to commit first degree murder, a Class A felony.  For his conviction, the defendant received a sentence of twenty-five years in the Tennessee Department of Correction.  On appeal, the defendant raises the following issues: (1) whether the trial court erred in denying the defendant's motion for a mistrial; (2) whether evidence of a fight between the defendant's cousin and the victim's uncle was properly admitted; and (3) whether the trial court erred in refusing to allow the defendant to impeach the victim's testimony with evidence of a prior conviction.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Alan E. Glenn and Camille R. McMullen, JJ., joined.

Lance R. Chism (at trial and on appeal), Memphis, Tennessee, for the appellant, Deangelo Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris J. Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The defendant was indicted on criminal attempt to commit first degree murder.  After a jury trial, the defendant was convicted of the charge and sentenced as a Range I, standard offender to twenty-five years incarceration.

The following pertinent testimony was presented at the trial.  Mr. Anthony Anderson, the victim, testified that he was twenty-six years old and had two children.  The victim stated that he

could not work and was pursuing a disability claim based on physical limitations resulting from gunshot wounds he sustained on October 6, 2006.

The victim stated that on the evening of October 5, 2006, he visited the residence of Bruce Hardy, his uncle, located at 536 Edith. When he arrived at his uncle's residence, Jamaris Davis, the defendant's cousin, nicknamed "Little Pete," and his uncle were standing outside and both were drunk. The victim recalled that the two men were arguing and his uncle reached down, picked up a stick, and hit Little Pete. The victim's uncle then got on top of Little Pete and started hitting him in the face. The victim grabbed his uncle and told him to go into the house. He helped Little Pete up, and told him, "sorry [my] uncle did you like that." The victim stated that he tried to calm Little Pete down, but he was still upset and was "hollering up there at the house telling him he was going to get him[.]" Little Pete continued to make threats and repeated to the victim that he was "going to get" Mr. Hardy. Because Little Pete was still "pumped up," the victim left. As the victim drove away, Little Pete "was standing in the street still raving on about what he was going to do."

The victim stated that he knew the defendant by his nickname, "Dirty Low." According to the victim, he had seen the defendant in the neighborhood for a couple of years and the defendant lived within walking distance of the victim's home. The victim spoke to the defendant whenever he saw him. The victim had seen Little Pete and the defendant together and had been told by both Little Pete and the defendant that they were cousins.

On the morning of October 6, 2006, the victim took his children to their grandmother's house and then went to 536 Edith, where the fight had taken place the evening before. After visiting with his uncle and cousins for a few minutes, the victim got into his vehicle and headed to Foote Homes, a residential complex, to visit another cousin. According to the victim,

> I was coming up the street, I seen the defendant . . . standing in the middle of the street with a[n] assault rifle, and he was waving it at my car. And he was telling me to stop. So when I got up on him, I stopped. And when [the defendant] opened the door . . . and put the gun down - -
>
> . . . .
>
> I hit the gas. And I took off up the street and when I took off up the street, he started shooting in the back of it [sic].
>
> . . . .
>
> Once I went up the street, I had turned, facing . . . Foote Homes, and I just [drove] down the street going toward Foote Homes and when I got to the light, it was a red light. I had stopped. . . . I looked in the rearview, I see [the defendant] . . . hanging out [of] the window of a car. And then [the defendant] started shooting again. So I [drove] across the [gas station] lot.

The victim identified the defendant as the shooter. He continued his testimony, stating as follows:

I turned in front of the Salem Market, and I seen my cousin. And I stopped right there and I told him . . . I [had] been shot. . . . [T]hey [are] shooting at me. And then he [asked] who's shooting at you? And I [said] Dirty Low and them. And then he [said] man, who are these folks behind you? And they had pulled up again and they started shooting again. So I just ran through the Foote Homes gate.

. . . .

[M]y cousin had finally caught up with me. He told me, man, go to the Med. . . . . And I just drove straight to the Med.

The victim described the gun used by the defendant saying it looked "[l]ike a AK-47." He recalled that he was not far from the defendant when he saw the defendant standing in the street holding a gun. The victim recounted that the incident began at approximately ten o'clock in the morning and stated that the light was bright. Upon seeing the defendant, the victim claimed that he knew "exactly who it was."

The victim stated that he spoke to his cousin in front of the store for only "a couple of seconds" before the defendant came around the corner and started shooting. As the vehicle carrying the defendant pulled up next to the victim's, the victim rammed the vehicle and drove through the gate at Foote Homes. The victim identified a photograph depicting the damaged gate at the entrance of Foote Homes. He said that he "tore down" the gate trying to get away from the defendant.

The victim testified that at the Regional Medical Center, "the Med," he told a Memphis police officer that he was shot by the defendant. On October 10, 2006, the victim went to the police station to view a photographic lineup. A photographic lineup identified by the victim was marked as a trial exhibit. The victim stated that he intended his statement to say, "this is the defendant that shot me with an AK-47." The victim said that his statement was written on the lineup sheet by his sister.

The victim agreed that in 2002, he pled guilty to unlawful possession of a controlled substance with the intent to sell and served a probated sentence. On cross-examination, the victim agreed that he and the defendant were not close friends and that he only knew the defendant as "Dirty Low." Mr. Anderson did not recall what his shooter was wearing, however, he stated that he saw the shooter and knew it was the defendant.

Bruce Hardy testified that on October 5, 2006, Little Pete came to his house drunk and urinated on his dog. Little Pete "talked crazy" and said something about having a gun. Mr. Hardy acknowledged that he had been drinking, and a fight ensued. Mr. Hardy recalled that the victim was there, but was not involved in the fight. Mr. Hardy agreed that he had a criminal record, including convictions for robbery, theft of property, and burglary of a motor vehicle. On cross-examination,

-3-

Mr. Hardy confirmed that in 1998 and 2002, he was convicted of theft of property under five hundred dollars.

Kenyatta Jenkins testified that on October 6, 2006, she was sitting in her car outside of the Salem Market waiting for Richard Franklin, the victim's cousin. Mr. Franklin exited the store as the victim drove up. As Mr. Franklin spoke to the victim, a car came around the corner and the victim "sped off." Mr. Franklin got into Ms. Jenkins' car and said that the victim had just been shot and was going to the Med. Ms. Jenkins did not see a gun but heard shots as the vehicle came around the corner. On cross-examination, Ms. Jenkins confirmed that in 2005, she was convicted of theft of property under five hundred dollars.

Doris Hardy, the victim's mother, testified that on October 6, 2006, she was shopping when she received a telephone call from the victim who was "screaming into the phone, Dirty Low is shooting at me [M]a, Dirty Low is shooting at me." Ms. Hardy proceeded home where her granddaughter ran out of the house and said that the victim was "getting shot." Ms. Hardy then received a phone call informing her that the victim was at the Med. When Ms. Hardy arrived at the Med, she saw that the victim's vehicle was damaged. Referring to photographs, Ms. Hardy pointed out bullet holes in the victim's vehicle. One photograph of the interior of the victim's vehicle indicated that a bullet entered the back of the vehicle and went through to the front seat. There were also bullet holes in the armrest, the driver's side seat, and the headrest. Ms. Hardy described one photograph as depicting "the blood and the flesh" of the victim on the front seat. When Ms. Hardy saw the victim in the critical care trauma center, he again told her, "Dirty Low shot me[.]" Ms. Hardy acknowledged that she had been convicted of unauthorized use of a credit card, and passing bad checks.

Latasha Hardy, the victim's sister, testified that she went to the police station with the victim to view a photographic lineup. Ms. Hardy knew the defendant and she saw Little Pete in the neighborhood "[a]ll the time." She knew that Little Pete and the defendant were friends. Ms. Hardy stated that the defendant and Little Pete "used to be together all the time." When asked if it appeared that the defendant and Little Pete "were good friends," Ms. Hardy responded, "Yeah. Seemed like it. Seemed like they were real cool."

Detective Robert Wilkie with the Memphis Police Department testified that upon arrival at the Med on October 6, 2006, he saw Little Pete who had just been released after receiving treatment for injuries sustained in a bad beating. Detective Wilkie proceeded inside the trauma center where he spoke with the victim. The victim told him that earlier on October 6th, as he was driving up Mississippi Street, he saw the defendant standing out in the street with a rifle and that as he drove past, the defendant started shooting. The victim told Detective Wilkie that he looked in his rearview mirror and saw the defendant hanging out of a car window shooting. The victim reported that he again saw the defendant in front of the store where he stopped to talk to his cousin. According to the victim, the defendant pulled up behind him and was hanging out of the car window and shooting a gun. The victim stated that he put his vehicle in reverse, rammed the other vehicle, drove across the median through the apartment gates, and drove to the Med.

Detective Dwayne Smith with the Memphis Police Department testified that one 7.62 caliber shell casing was found outside the store located at 589 Mississippi. Several more 7.62 caliber shell casings were found at the intersection of Mississippi and Crump. Officer Laverne Jones identified "a sketch of Mississippi, Crump and Provine Streets where [she] located evidence," consisting of three 7.62 caliber shell casings.

Special Agent Steve Scott with the Tennessee Bureau of Investigation testified that in connection with this case, he examined four rifle fired shell casings received from the Memphis Police Department. From his examination, Agent Scott was able to determine that all four casings were 7.62 by 39 millimeter caliber casings made by a Russian manufacturer. Additionally, examination of the firing pin impressions indicated that all four casings were fired from the same gun, either an AK-47 rifle, or a SKS rifle. Agent Scott did not know the weight of an AK-47 rifle; however, in his opinion, an adult man would be able to hold up and shoot the rifle while leaning out of a car window.

Jerry Chatman, a Detective with the Memphis Police Department, testified that as case coordinator on this investigation, he took reports from field officers and also compiled photographs for a photographic lineup. Upon viewing the photographic lineup, the victim immediately selected the defendant as his shooter. On direct examination, Detective Chatman testified in pertinent part as follows:

| | |
|---|---|
| The Prosecutor: | You spoke with [the victim] on the 10th? |
| Detective Chatman: | Yes. |
| The Prosecutor: | And then at some point after the 10th, a warrant was issued for [the defendant's] arrest? |
| Detective Chatman: | Correct. |
| The Prosecutor: | Okay. And eventually [the defendant] is taken into custody? |
| Detective Chatman: | Correct. |
| The Prosecutor: | Okay. Did [the defendant] make a statement? |
| Detective Chatman: | No, sir. |

In a bench conference that followed, defense counsel objected to Detective Chatman's testimony regarding the defendant's post-arrest silence and requested a mistrial. The defendant's motion was denied and the examination of Detective Chatman regarding his duties as the case coordinator resumed.

The defendant did not testify on his own behalf. After closing arguments, the jury was instructed on criminal attempt to commit first degree murder and lesser included offenses. The jury returned a verdict, finding the defendant guilty as charged. The defendant appealed.

ANALYSIS

I. Necessity for a mistrial

The defendant asserts that the trial court should have declared a mistrial after Detective Chatman testified that the defendant did not make a statement to the police after his arrest. Specifically, the defendant argues that his post-arrest silence was used as substantive evidence of guilt, therefore the trial court erred in denying his request for a mistrial.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold*, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land*, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.* When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003).

It is well established that a defendant may not be penalized at trial for the exercise of his constitutional right to remain silent after arrest. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976); *Braden v. State*, 534 S.W.2d 657, 661 (Tenn. 1976). Generally, the prosecution may not comment at trial that a defendant invoked the right to remain silent in the face of accusation. *Braden*, 534 S.W.2d at 650; *Ware v. State*, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978). However, a comment on a defendant's silence may be harmless error that does not require a mistrial. *See Honeycutt v. State*, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976).

The United States Supreme Court has recognized the applications of the harmless error doctrine to constitutional violations. *Chapman v. California*, 386 U.S. 18, 24 (1967). Tennessee courts have held that a prosecutor's improper comment regarding a defendant's privilege against self-incrimination was not reversible error if it can be established that the error was harmless beyond a reasonable doubt. *State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) (citing *Lyons v. State*, 596 S.W.2d 104, 107 (Tenn. Crim. App. 1979), *perm. app. denied* (Tenn. 1980)); *see also*

*State v. Terry Lucas*, No. 01C01-9811-CC-00458, 2000 WL 19537, at *4 (Tenn. Crim. App., at Nashville, Jan. 13, 2000) (holding that an improper comment upon the defendant's right to remain silent made by one of the state's witnesses did not rise to the level of reversible error); *and State v. Daronopolis R. Sweatt*, No. M1999-2522-CCA-R3-CD, 2000 WL 1649502, at *7 (Tenn. Crim. App., at Jackson, Nov. 3, 2000) (holding that asking the defendant why the alibi he asserted at trial had not been provided by him during his pre-trial confinement was harmless error).

In the instant case, Detective Chatman's comment regarding the defendant's post-arrest silence was improper. However, we do not agree that the comment created a "manifest necessity" for a mistrial. First, there is no implication that the prosecutor deliberately elicited the comment in order to create an inference of guilt on the part of the defendant. *See Lucas*, 2000 WL 19537, at *4. Second, when viewed in context, it is not evident that "the jury would necessarily draw an inference of guilt" from Detective Chatman's comment. *See id.* In his testimony, Detective Chatman gave a chronological account of events surrounding his investigation of the case. The prosecutor asked only one question regarding whether the defendant gave a statement. Third, the prosecutor did not refer to the defendant's post-arrest silence in his closing argument. *See id.* Fourth, although no curative instruction was given after the improper comment by Detective Chatman, no such instruction was requested. *See id.* A defense counsel's failure to request a curative instruction is a failure to take action "reasonably available to prevent or nullify the harmful effect of an error." *See* Tenn. R. App. P. 36(a). Finally, the state's case against the defendant was strong and suggests that the jury would have been compelled to convict the defendant in the absence of the improper comment. The proof at trial showed that during the attack and chase, the victim identified the defendant as the shooter to his mother and his cousin. The victim further identified the defendant as the shooter to a police officer who interviewed him at the Med on the day of the shooting. Four days later, the victim picked the defendant out of a photographic lineup. Shell casings found at two separate locations identified by the victim as where the defendant shot his gun were determined to have been made by the same Russian manufacturer, were of the same caliber, and were shot from the same rifle. Evidence of damage to the victim's vehicle and to the gate at Foote Homes further corroborated the victim's statement and supported the jury's verdict. Viewing the record as a whole, we cannot find that the improper reference to the defendant's post-arrest silence had a prejudicial effect upon the jury's verdict. We conclude, that the trial court did not abuse its discretion when it denied the motion for a mistrial. Defendant is not entitled to relief on this issue.

## II. Admissibility of evidence

The defendant argues that testimony of a fight between the defendant's cousin and the victim's uncle was not relevant and therefore inadmissible. The defendant asserts that the state was required to show that the defendant was present at the fight or had knowledge of the fight; however, he cites to no authority to support his assertion. In the alternative, the defendant avers that even if the evidence is relevant to show the defendant's motive, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The defendant contends that the trial court abused its discretion in allowing the introduction of such evidence and further argues the error cannot be considered harmless error. The state asserts that the evidence showed that the defendant had a motive in shooting the victim and was therefore relevant to show premeditation.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will be overturned on appeal only upon the showing of abuse of that discretion. *State v. Saylor*, 117 S.W.3d 239, 247 (Tenn. 2003). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a concussion that is illegal or unreasonable and causes injustice to the party complaining. *See, e.g., Howell v. State,* 185 S.W.3d 319, 337 (Tenn. 2006).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. *Id.* § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

At issue is evidence of a fight on the night before the shooting between the defendant's cousin, Little Pete, and the victim's uncle, Bruce Hardy. Little Pete was badly beaten by Mr. Hardy and received injuries requiring medical attention. Prior to the trial, the court addressed the defendant's motion to exclude evidence of the fight. The trial court reserved its ruling on the issue and stated that, upon an objection at trial, a determination would be made regarding the admissibility of such evidence. During the testimony of the victim, the defendant raised an objection to the admission of testimony regarding the fight and argued that the probative value of the evidence was outweighed by the danger of prejudice to the defendant. The court overruled the objection and allowed the testimony. The disputed evidence included testimony that Little Pete urinated on Mr. Hardy's dog, "talked crazy" to Mr. Hardy, and mentioned having a gun. The evidence further showed that a fight ensued and Little Pete was badly beaten by Mr. Hardy. The victim testified that after he broke up the fight, Little Pete threatened Mr. Hardy, "telling him he was going to get him," and when the victim drove away, Little Pete continued to rant in anger and made threats about "what he was going to do." Testimony established that Little Pete and the defendant were cousins, were often seen together, and appeared to have a close relationship.

We conclude that evidence of the fight was relevant to establish a motive for the attempted killing, a factor from which the jury could infer premeditation. *See Leach*, 148 S.W.3d at 54. Additionally, we note that evidence of a close relationship may support a finding of premeditation where a jury could have inferred from the relationship a motive for the defendant's actions. *See State v. Martha Ann Freeman and Rafael Dejesus Rocha-Perez,* No. M2006-02751-CCA-R3-CD, 2008 WL 833936, at *16 (Tenn. Crim. App., at Nashville, Mar. 28, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008). From evidence of threats made by Little Pete and evidence of the defendant's

familial tie and close relationship with Little Pete, the jury could infer a motive for the attempted killing which was relevant to the question of premeditation.

The defendant asserts that even if the evidence at issue was relevant, its admission unfairly prejudiced the defendant. However, as noted by the Tennessee Supreme Court:

> prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one.

*State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005) (*citing State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). Motive is a proper factor to be considered in a determination of whether a killing was premeditated. *See Leach,* 148 S.W.3d at 54. We conclude that the evidence at issue, from which the jury could infer the defendant's motive, does not create unfair prejudice to the defendant. Based on the foregoing, the defendant has not shown that the trial court abused its discretion in allowing evidence of the fight between the victim's uncle and the defendant's cousin.

### III. Impeachment of testimony

The defendant asserts that the trial court erred when it ruled that the victim could not be impeached with a prior conviction. The state concedes that the trial court erred. However, the state asserts that "the error was harmless in light of the overwhelming evidence of the defendant's guilt." During the cross-examination of the victim, defense counsel requested that he be allowed to impeach the witness on his conviction of unauthorized use of a motor vehicle. Noting that the conviction was a misdemeanor offense, the trial court denied the request. However, before closing arguments in a jury-out hearing, defense counsel announced that the state had agreed to stipulate that the victim had been convicted of the offense. The trial court stated "[i]f you're going to stipulate [to] that, you can mention that to the jury when they come back." Defense counsel indicated that he was noting the stipulation only for the record.

The Tennessee Rules of Evidence allow a witness's credibility to be impeached by a prior conviction if the conviction was a felony conviction or involved dishonesty or false statement. Tenn. R. Evid. 609(a)(2). A trial court's evidentiary ruling under this rule will not be overturned absent an abuse of discretion. *State v. Mixon*, 983 S.W.2d 661, 675 (Tenn. 1999).

In the instant case, the trial court refused to allow the defendant to impeach the victim's testimony with evidence of a prior misdemeanor conviction involving the unauthorized use of a vehicle. However, as conceded by the state, a conviction for the unauthorized use of a vehicle is a crime of dishonesty and therefore is admissible to impeach the credibility of a witness. *See State v. Lee Turner*, No. M2005-02749-CCA-R3-CD, 2007 WL 845894, at *7 (Tenn. Crim. App., at Nashville, Mar. 16, 2007), *perm. app. denied* (Tenn. June 25, 2007); *see also, State v. Larry Leonard Joyner, Jr.*, No. 7, 1991 WL 72004, at *4 (Tenn. Crim. App., at Jackson, May 8, 1991), *perm. to*

*app. denied* (Tenn. Sept. 9, 1996). Therefore, we conclude that the trial court erred by refusing to allow the defendant to cross-examine the witness with respect to this conviction.

While we acknowledge the trial court erred with respect to the admissibility of the victim's prior conviction, we determine the error was harmless. *See* Tenn. R. App. P. 36(b). To begin, we note that the jury was aware that the victim had a criminal history since he admitted in his direct testimony that he had been convicted of possession of cocaine. Other evidence corroborated the testimony of the victim regarding the identity of the shooter and the circumstances of the shooting. Evidence showed that during the crime, the victim identified the defendant as the shooter to his mother and his cousin. After the crime, the victim identified the defendant to a police officer at the Med and again in a photographic lineup. Evidence also showed that shell casings were found at more than one location identified to the police by the victim as where the defendant shot his gun. The shell casings were of the same caliber, from the same Russian manufacturer, and fired from the same rifle. Evidence of the victim's injuries and evidence of damage to the victim's vehicle and to the gate at Foote Homes also support the victim's testimony. Therefore, we conclude that the probative value of the conviction was cumulative of other impeachment evidence and unlikely to have affected the jury's verdict. Additionally, we note that before closing arguments and before the jury entered the courtroom, defense counsel announced that the state had agreed to stipulate to facts surrounding the conviction at issue. The trial court stated that, given the stipulation, the conviction could be mentioned to the jury. However, the record indicates that defense counsel did not mention the conviction to the jury. Defense counsel thereby failed to take action available to prevent or nullify any harmful effect of the error. *See* Tenn. R. App. P. 36(a). We conclude that the trial court's refusal to allow the defendant to cross-examine the victim about his prior conviction was harmless error. Consequently, the defendant is not entitled to relief on this issue.

CONCLUSION

Based on the foregoing, we affirm the defendant's conviction and sentencing.

_____
J.C. McLIN, JUDGE

-10-